UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| IN THE MATTER OF AN APPLICATION | ) | 14-91051-DJC |
|---|---|---|
| OF THE UNITED STATES FOR | ) | |
| AN ORDER AUTHORIZING THE | ) | |
| INTERCEPTION OF WIRE | ) | AFFIDAVIT SUBMITTED IN |
| COMMUNICATIONS TO AND FROM | ) | SUPPORT OF APPLICATION FOR |
| AN AT&T CELLULAR PHONE | ) | THE INTERCEPTION OF WIRE |
| ASSIGNED PHONE NUMBER (917) | ) | COMMUNICATIONS |
| 714-8868, BEARING IMSI NUMBER | ) | |
| 310410588559427; AND A T-MOBILE | ) | **FILED UNDER SEAL** |
| CELLULAR PHONE ASSIGNED PHONE | ) | |
| NUMBER (917) 714-8866, BEARING | ) | |
| IMSI NUMBER 310260124593505 | ) | |

INTRODUCTION

I, Michael J. Krol, being duly sworn, depose and state as follows:

1.     I am an investigative or law enforcement officer of the United States, within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct

investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United

States Code.

2.     I have been a Special Agent since 2004.   I was a Special Agent with the United

States Department of Justice, Drug Enforcement Administration ("DEA") from December 2004

through November 2009.   In November of 2009, I transferred to the United States Department of

Homeland Security ("DHS"), Homeland Security Investigations ("HSI").[1]   I am currently

assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force

in Watertown, Massachusetts, along with agents from other federal, state, and local law

enforcement agencies, including the DEA, the Federal Bureau of Investigation ("FBI"), and the

---

[1]Prior to becoming Homeland Security Investigations, HSI was known as Immigration and Customs Enforcement
("ICE").

1

USAO00000026

Massachusetts State Police ("MSP"). Since becoming a Special Agent with the DEA and then HSI, I have conducted numerous investigations of unlawful drug distribution and importation in violation of 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952, 960 and 963, the laundering of drug proceeds in violation of 18 U.S.C. §§ 1956 and 1957, and have conducted and participated in wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and witnesses and reviewed recorded conversations, telephone, financial records and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. Through my training, education and experience, I have become familiar with the manner in which narcotic proceeds are laundered both domestically and internationally.

3. Based on my training and experience, I also know that drug traffickers and money launderers often communicate about their illicit activities over multiple cellular phones and often use coded and/or vague language in order to thwart electronic surveillance. In particular, I know that drug traffickers and money launderers often change their cellular phone devices and phone numbers, and are careful with whom they share their cellular telephone numbers in order to avoid electronic surveillance and wiretaps. I also know that drug traffickers and money launderers often maintain a consistent cellular phone number in order to make facilitate contacts with criminal associates in non-criminal conversations, and coordinate the communication of illicit activities over different cellular phones as well as other communication devices. In addition, more sophisticated drug trafficking and money laundering networks now often utilize e-mail, including draft e-mail messages and instant messaging; BlackBerry devices PIN-to-PIN

2

USAO0000002'

communications, including encrypted PIN-to-PIN or "Instant Messenger" communications; and

Voice over Internet Protocol and video chat services like "Skype" communications.

### PURPOSE OF AFFIDAVIT

4.     This Affidavit is being submitted in support of an application for an order

authorizing the interception of wire communications of individuals known as SALOMON

BENDAYAN, █████████████████████████████████

█████████████████████ MARTIN LUSTGARTEN, █████████████████

█████████████ and others as yet unknown (hereinafter, the "Target Subjects") concerning

offenses enumerated in 18 U.S.C. §2516, namely, the laundering of monetary instruments, in

violation of 18 U.S.C. §§ 1956 and 1957 and conspiracy to launder monetary instruments, in

violation of 18 U.S.C. § 1956(h).

5.     Authorization is sought for an Order, pursuant to 18 U.S.C. §2518 to intercept wire

communications, including any voice-mail messages intercepted as they are left or retrieved, to

and from the following devices (hereinafter collectively, "the Target Telephones"):

> (A) an AT&T Wireless cellular phone assigned phone number (917) 714-8868,
> subscribed to PILOT HOLDINGS INC C/O J CALVO, 400 AVENUE U APT 307,
> BROOKLYN, NY 11223, and bearing IMSI[2] 310410588559427, used by
> SALOMON BENDAYAN (hereinafter "Target Telephone #1"); and
>
> (B) a T-Mobile Wireless cellular phone assigned phone number (917) 714-8866,
> subscribed to Bedrock Holdings America, 148 MADISON AVE FL 9, NEW
> YORK, NY, 10016, and bearing IMSI 310260124593505, used by SALOMON
> BENDAYAN (hereinafter "Target Telephone #2").

---

[2]The IMSI ("International Mobile Subscriber Identifier") is a unique identification associated with all GSM, UMTS and LTE network mobile phone users.  It is stored as a 64 bit field in the SIM ("Subscriber Identity Module") circuit which is imbedded into a removable plastic card and commonly referred to as a "SIM Card."  The SIM Card can be transferred between different mobile devices, but retains the IMSI, which is coded as a 13 to 15 digit long numeric field that the mobile phone sends to the phone's cellular phone network.  The cellular network uses the IMSI to identify the details of the mobile device on the service provider's cellular network in order to complete the call and for billing purposes.

3

6.      It is requested that the interception of the Target Telephones be authorized until the attainment of the authorized objectives or, in any event, at the end of thirty (30) days, measured from the earlier of the day on which the investigative or law enforcement officers first begin to conduct the interception under the Court's Order or ten (10) days after the Order is entered, whichever is earlier.

7.      It is further requested that the Order apply not only to the target telephone numbers listed above, but also to any other telephone numbers or telephones accessed through the above-referenced IMSI numbers, and to any other IMSI numbers accessed through the target telephone numbers referenced above, within the thirty (30) day period.

8.      It is further requested that authorization apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

9.      I have personally participated in the investigation of the Target Subjects named in this Affidavit since December 2012.   Additionally, I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other law enforcement agents from HSI, the DEA, the U.S. Treasury Department, and other federal, state, and foreign law enforcement agencies.

10.     Based upon all of the facts recited in the paragraphs below, I allege the following:

      a.      There is probable cause to believe that the Target Subjects are committing and will continue to commit offenses involving the laundering of monetary instruments, in violation of 18 U.S.C. §§ 1956 and 1957 and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h);

4

USAO00000029

b.      There is probable cause to believe that the Target Telephones are presently in the possession of and being used by BENDAYAN and others in an international network of money launderers;

c.      There is probable cause to believe that wire communications will occur over the Target Telephones in furtherance of the aforementioned offenses. In particular, these communications are expected to constitute admissible evidence regarding the Target Offenses; the identity of the participants and conspirators in the money laundering network under investigation; the manner and means through which the Target Subjects launder proceeds of drug trafficking, including the identity of bank accounts, shell corporations, and businesses used to conceal illegally derived proceeds; and the precise nature and scope of the illegal activity of the Target Subjects and others unknown;

d.      There is probable cause to believe that the Target Telephones will continue to be used in connection with the commission of the above-described offenses; and

e.      As discussed in this Affidavit, normal investigative procedures have been tried and have failed, reasonably appear unlikely to succeed if continued, reasonably appear unlikely to succeed if tried, or are too dangerous.

11.     Since this Affidavit is being submitted for the limited purpose of securing the authorization for the interception of the Target Telephones, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are

5

USAO00000030

necessary to establish the necessary foundation for an Order authorizing the interception of the requested wire communications.

PREVIOUS APPLICATIONS

12.     On or about February 11, 2014, I received the results of a search I had caused to be made of the Electronic Surveillance Indices of the FBI, the DEA, and DHS to determine whether previous applications have been made to intercept the oral, wire, or electronic communications of Target Telephones and/or the Target Subjects of this investigation.   The results of that search and my own inquiry of other law enforcement agencies revealed that, other than those previous applications listed in Attachment A to this affidavit, there are no other previous applications for the Target Telephones or Target Subjects described above.   In addition, as described in detail below, two ongoing foreign wiretap investigations authorized under the laws of Argentina and Colombia involve some of Target Subjects.   In particular, in September 2013, Argentina Customs officials began a wiretap investigation into the money laundering activities of ███████ and others and are presently intercepting a telephone used by █████   The communications of Target Subjects ████████ and SALOMON BENDAYAN have been intercepted during the Argentinean wiretap.   In October 2013, the Colombian National Police began a wiretap investigation into ███████████████████ and others and are presently intercepting a telephone used by ████████   The communications of Target Subjects ████████████████ and SALOMON BENDAYAN have been intercepted during the Colombian wiretap.

PERSONS EXPECTED TO BE INTERCEPTED

13.     The following persons are expected to be intercepted using the Target Telephones in the commission of one or more of the alleged offenses described above:

6

a. SALOMON BENDAYAN (DOB: 11/19/63): BENDAYAN was born in Morocco, has dual citizenship in Morocco and Canada, but resides in the United States and has legal permanent residency in the United States. BENDAYAN is believed to have an apartment in Aventura, Florida, and an apartment in Brooklyn, New York. BENDAYAN travels extensively around the world and is believed to be involved in the laundering of millions of U.S. dollars in Colombia, Venezuela, Argentina, and China through trade-based money laundering schemes. BENDAYAN has several shell corporations based in Florida and New York that are believed to be involved in trade based money laundering schemes. BENDAYAN is the user of both the Target Telephones.

b. 

c.

USAO00000032

d. [redacted]

e. MARTIN LUSTGARTEN (DOB: 6/4/65): LUSTGARTEN is a Venezuelan citizen living in Panama who was previously business partners with both BENDAYAN and EDUARDO ENRIQUE SOTO. In March 2009, the DEA in Boston seized a bank account used by LUSTGARTEN and EDUARDO ENRIQUE SOTO as part of an international money laundering investigation.

f. [redacted]

USAO00000033



g.

<u>BACKGROUND OF INVESTIGATION</u>

A.    <u>Overview of Investigation</u>

14.    The instant investigation targets a network of international money launderers involved in laundering millions of U.S. dollars and other currencies in the United States and around the world.



15.     The investigation into [REDACTED] began following a long-term marijuana

trafficking investigation that targeted SAFWAN MADARATI of Watertown, Massachusetts.

The investigation revealed that large quantities of marijuana that were being imported into

Northeastern United States from Canada and the seizure of more than $2.7 million in drug

proceeds in Massachusetts.   Two of the individuals who were identified as being involved in the

laundering of these drugs proceeds were Canadian citizens [REDACTED]

17.     In approximately June 2013, based on phone records, both CHAMAS and

[REDACTED] were in telephone contact with [REDACTED] a resident of Buenos Aires,

Argentina, and who, according to Argentinian law enforcement officials, is involved in exporting

cocaine to the United States and elsewhere as well as money laundering offenses.   In September

USAO00000035

2013,  flew from Mexico into Boston, Massachusetts, where he remained for one day and then returned to Mexico. During a border search of ███████████ phone, U.S. Customs and Border Patrol officers found phone numbers for ███████████████████ in his phone.

18.    In September 2013, Argentina Customs officials began a court authorized wiretap investigation of ████████ The wiretaps are ongoing and thus far have revealed that LAOUI and others are involved in moving millions of U.S. dollars in Argentina; chartering private jets carrying cash to Uruguay; and investing in Mexican and Argentinean bonds that paid out in the United States. On October 1, 2013, Argentina Customs officials observed ████████ meet with SALOMON BENDAYAN, the user of the Target Telephones. BENDAYAN resides in New York, but is affiliated with multiple businesses in Miami, Florida. After meeting with █████████ Buenos Aires, BENDAYAN then boarded a chartered flight to Uruguay with two Colombian males, ████████████████████████████████ According to a cooperating defendant in money laundering prosecutions (referred to CD-1), BENDAYAN is involved in trade-based money laundering between Colombia and Venezuela.

19.    Beginning in October 2013, Customs officials in Argentina began intercepting calls between BENDAYAN's Target Telephone #1 and ████████ Beginning on January 3, 2014, BENDAYAN began automatically forwarding all of the incoming calls into Target Telephone #1 to a second phone used by BENDAYAN, Target Telephone #2. As further described below, during these intercepted calls, investigators believe that ████████ and BENDAYAN have discussed several ongoing money laundering operations.

20.    Following the initiation of the Argentina wiretap investigation, Colombian law enforcement officers began a wiretap investigation in Colombia that is directed at ████████

11

# ATTACHMENT A

*Argentina Wiretap Investigation*

1. On or about August 29, 2013, the presiding judge in Buenos Aires, Argentina, the Honorable Federal Judge Adrian Gonzalez Charvay, authorized for a period of 60 days the interception of the following cellular telephones used by ██████████ in Argentina: 11-5419-2026 and 33-4998-7555.

2. On or about October 24, 2013, the presiding judge in Buenos Aires, Argentina, the Honorable Federal Judge Adrian Gonzalez Charvay, authorized for a period of 30 days the interception of the Nextel Point to Point ("PTT") number 54*446*83 used by ██████ ██████ in Argentina.

3. On or about November 28, 2013, the presiding judge in Buenos Aires, Argentina, the Honorable Federal Judge Adrian Gonzalez Charvay, authorized a 30 day extension of the interception of the following cellular telephones used by ████████████ n Argentina: 11-5419-2026 and 33-4998-7555.

4. On or about January 29, 2014, the presiding judge in Buenos Aires, Argentina, the Honorable Federal Judge Adrian Gonzalez Charvay, authorized a 30 day extension of the interception of the following cellular telephones used by ████████████ in Argentina: 11-5419-2026, 11-4998-7555, as well as Nextel PTT 54*446*83 used by ███████

*Colombia Wiretap Investigation*

5. Beginning in or about November 2013, the presiding Colombian prosecutor in Bogotá, Colombia authorized the interception the following cellular phones used by ███████ ██████████████████████ in Colombia: 310-212-3164 and 315-240-7410. Specifically, pursuant to this authorization, on or about November 13, 2014, Colombian law enforcement officials began the interception of cellular phone number 310-212-3164. Thereafter, on or about February 18, 2014, Colombian law enforcement officials began the interception of cellular phone number 315-240-7410. The interception of these cellular phones is authorized for a period of 90 days, but is subject to the ratification by a judge in Colombia.

On November 26, 2013, Colombian law enforcement officials intercepted a call between BENDAYAN (while using Target Telephone #1) and ███████████, in which investigators believe they discussed their money laundering business with ████ More recently, in February 2014, Colombian officials intercepted a call between ███████ and one of BENDAYAN's associates, ██████████ about wiring $500,000 to Colombia and meeting with ██████████ n Bogotá.

21.    An analysis of telephone records reveals that BENDAYAN is in frequent contact with MARTIN LUSTGARTEN and ████████████████ money brokers in Venezuela. In March 2009, the DEA seized two bank accounts that LUSTGARTEN and ████ were using at Bank of America in Miami, Florida. ████operates a company in Hong Kong called A&L Services Limited.   Investigators believe that BENDAYAN may be using████ bank accounts to launder drug proceeds in a complex trade-based money laundering scheme.   A preliminary investigation has revealed that BENDAYAN has opened more than 90 different bank accounts in the United States at JP Morgan Chase.



USAO000000037





13

USAO00000038

C.    The SAFWAN MADARATI Investigation.

25.    Beginning in August 2010, law enforcement agents from HSI and the
DEA began a wiretap investigation into the marijuana trafficking activities of SAFWAN
MADARATI.   In connection with the MADARATI wiretap investigation, on October 5, 2010,
law enforcement agents seized $1,041,990 in drug proceeds from NICHOLAS SOTIRIOU and
DOMENICO GUZZI, two couriers from Canada.   SOTIRIOU and GUZZI both claimed that the
money belonged to *Ghanadian Trading,* a gold purchasing company based in Canada.

26.    On October 22, 2010, DEA agents in Los Angeles, California, seized
approximately $672,000 in suspected drug proceeds from NICOLAS ANTHIS, one of the
purported owners of *Ghanadian Trading*.   Five days later, on October 27, 2010, law enforcement
agents seized another $1,766,900 in drug proceeds from two Canadian men identified as
GARABET JARTIDIAN and BENJAMIN JARTIDIAN at Hanscom Airport in Bedford,
Massachusetts.   Before the seizure, agents observed GARABET JARTIDIAN pick up a large
suitcase from SAFWAN MADARATI, the target of the drug investigation.   This same suitcase
was seized from JARTIDIAN and was found to contain a portion of the $1,766,900 in cash that
was seized.   At the time of the seizure, GARABET JARTIDIAN told the Massachusetts State
Police that the money belonged to ANTHIS and a second individual, ELIAS KAPERONIS, of
*Ghanadian Trading LLC*.

27.    The investigation later revealed that the cash seized in California and
Massachusetts was the proceeds from the sale of marijuana that a criminal organization in
Montreal, Canada, had imported into the Northeast, and was being transferred to California for the
purchase of cocaine that would be imported into Canada.   ANTHIS and others from Canada

14

chartered private jets on the East Coast, and personally transported the money to California, where it was handed off to individuals involved in supplying cocaine to the organization in Canada.



29.    In April 2011, federal law enforcement agents arrested MADARATI and ten others pursuant to a criminal complaint charging drug trafficking and extortion.  On May 19, 2011, an indictment was returned in *United States v. Madarati, et al.*, 11cr10195-RWZ.  Among other charges, the indictment charges MADARATI, ANTHIS, KAPERONIS and others with conspiracy to launder monetary instruments.  MADARATI pled guilty to the charges in the indictment on June 13, 2013, and was sentenced to a term of incarceration of 144 months on January 14, 2014.  ANTHIS was arrested on the indictment in the District of Nevada in August 2011, pled guilty in the District of Massachusetts to conspiracy to laundering monetary instruments on November 26, 2013, and is scheduled to be sentenced on March 6, 2014.



16

USAO00000041



36.     As further described below, in June 2013, both ████████████
were in telephone contact with ████████████ n Argentina, an associate of SALOMON
BENDAYAN, the user of the Target Telephones. ████████████

USAO0000004



18

USAO00000043



---

[3]Under 18 U.S.C. § 1956(c)(7), "specified unlawful activity" includes "with respect to a financial transaction occurring in whole or in part in the United States, an offense against a foreign nation involving . . . bribery of a public official, or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official." 18 U.S.C. § 1956(c)(7)(B)(iv).



20

USAO00000045



21

USAO000000



22

USAO00000047



23

USAO000000



24

USAO00000049

th



USAO0000005

████████████████████████████████████

E.    <u>DEA Undercover Investigation Fire & Ice</u>.

59.    In approximately 2007, the DEA in Boston initiated an undercover money laundering investigation dubbed "Operation Fire and Ice." Through the use of a DEA confidential informant, DEA Task Force Officer Jaime Cepero infiltrated a network of money laundering brokers in Venezuela and Colombia. Between 2007 and May 2011, TFO Cepero posed as a Massachusetts-based money launderer who, in exchange for a percentage commission, could pick up drug proceeds in a "money-drop" or "pick-up" transaction in the United States and elsewhere, deposit the money into banks accounts in Massachusetts, and wire the funds to other bank accounts both inside and outside the United States for laundering.

60.    The original target of the investigation was CARLOS ZAMBRANO, a money broker in Venezuela. Between September 2007 and February 2009, Operation Fire and Ice led to the pick-up of more than $4.6 million in drug proceeds in New York City, Philadelphia, Guatemala City, Mexico City, and Rome in fourteen different pick-up operations. After the cash pick-ups, ZAMBRANO and/or his associates e-mailed the wire transfers instructions to the undercover agent, DEA Task Force Officer Cepero. ZAMBRANO directed Task Force Officer Cepero to wire the drug money (more than $3 million) to one of four different bank accounts held at Bank of America in Miami, Florida, under the name "Rosemont." The investigation later revealed that there were a total of 59 bank accounts held at Bank of America each under name "Rosemont" (the "Rosemont Accounts").

USAO00000051

61.     The DEA investigation revealed that a Venezuelan male living in Florida, Rama K. Vyasulu, opened the Rosemont Accounts on behalf of various *casas de bolsa* or *casas de correjates* (brokerage houses) in Venezuela.   For the most part, these Venezuelan brokerage houses purportedly were using the Rosemont Accounts for offshore "bond swaps," a then-existing currency market in Venezuela (called the *"Permuta"*) that enabled individuals to circumvent Venezuelan currency restrictions and obtain U.S. dollars. The Venezuelan government strictly controls the exchange of U.S. dollars and Venezuelan *Bolivars*.   In order legally to obtain U.S. dollars with *Bolivars* in Venezuela, individuals and businesses must apply to the Venezuelan government, through an entity known as *CADAVI* in the Finance Ministry *(Comisión de Administración de Divisas)* (the Exchange Administration Board).   The *CADAVI* process, however, has been described as burdensome and time consuming. An application for U.S. dollars can take months to process.   The *Permuta* market was created to circumvent these restrictions.

62.     The DEA's investigation revealed that, while the *Permuta* was used for legitimate transactions, it also was susceptible to money launderers and used to launder millions of U.S. dollars from the United States to Colombia through Venezuela.   Between September 2007 and February 2009, the targets of the investigation used the DEA undercover operation run by Task Force Officer Cepero to launder more than $3 million into several different Rosemont Accounts. On March 23, 2009, the DEA executed seizure warrants for the 59 Rosemont Accounts and seized more than $151 million.   On the same day, the DEA also arrested Vyasulu on money laundering charges pursuant to a money laundering "sting" operation in which Vyasulu laundered $900,000 in U.S. government funds that an undercover agent represented to be drug proceeds.

63.     The accounts the DEA seized on March 23, 2009, included two accounts under the name Rosemont Q Corporation, one "doing business as" ("d/b/a") Clifton Capital S.A. and a

27

second d/b/a Arbitrage & Lending Incorporated. Based on records and information that the DEA obtained from Vyasulu, the directors of the company that held the Rosemont Q Accounts (Clifton Capital and Arbitrage & Lending) were MARTIN LUSTGARTEN and EDUARDO ENRIQUE-SOTO.[5] Based on records obtained from Bank of America, SOTO was one of four individuals who had authority to conduct transactions with these bank accounts. In total, the DEA seized more than $3.7 million from these two "Rosemont Q" accounts, and ultimately forfeited $575,380. While the initial seizure was based on the use of these bank accounts to facilitate money laundering offenses, the agreed upon forfeiture was based on Rosemont's operation of an unlicensed money remitter business, in violation of 18 U.S.C. § 1960.

64.     Based on telephone toll records and pen register data, two of BENDAYAN's frequent contacts are LUSTGARTEN and SOTO. According to HSI agents in Hong Kong, there is an active Hong Kong company called A&L SERVICES LIMITED, formerly known as "ARBITRAGE AND LENDING LTD," which was incorporated in October 2008. The registered directors are EDUARDO ENRIQUE SOTO and Josefina Wannoni (who is SOTO's mother). As further described below, investigators believe that BENDAYAN and SOTO are using A&L SERVICES LIMITED in Hong Kong to launder drug proceeds in a trade-based money laundering scheme.

65.     Following the seizure of the Rosemont Accounts in March 2009, DEA Task Force Officer Cepero continued to maintain contact with the targets of the investigation, and began negotiating more directly with the ultimate primary target of the investigation, ALDO

---

[5] During the forfeiture process, LUSTGARTEN obtained counsel and provided documents to the DEA and the U.S. Attorney's Office regarding his business activities pursuant to a proffer letter. LUSTGARTEN and SOTO also submitted affidavits and denied any involvement in money laundering. Nonetheless, since the information that LUSTGARTEN and SOTO provided was done pursuant to a proffer letter, your affiant is not relying upon any of the information that LUSTGARTEN and SOTO provided for probable cause.

USAO00000053

FERNANDO GUERRERO-CLAVIJO. In June 2009, however, a transaction involving $575,125 in drug money that TFO Cepero picked up in Puerto Rico for ZAMBRANO and GUERRERO resulted in a dispute between ZAMBRANO and GUERRERO. The dispute arose over ZAMBRANO's delay in paying out the drug money in Venezuelan Bolivars to GUERRERO which caused GUERRERO to lose money because of the fluctuation in the exchange rate. As a result, GUERRERO stopped working with ZAMBRANO. Nonetheless, between 2008 and May 2011, GUERRERO directed TFO Cepero to launder more than $7 million in drug proceeds and engaged in direct conversations with TFO Cepero about arranging for the importation of cocaine into the United States. One of the individuals who helped GUERRERO launder approximately $1.7 million in drug money was ANDRES COVELLI-CADAVID. In January 2011, TFO Cepero participated in an undercover meeting with GUERRERO and COVELLI in Bogota, Colombia, in which COVELLI explained the way he launders money through one of his shell companies in Colombia, CI FERAN S.A.

66. In June 2011, COVELLI, GUERRERO, and ten others were arrested in Colombia and thereafter extradited to the District of Massachusetts to face money laundering charges in criminal case number 11cr10187-PBS. As further described below, COVELLI pled guilty to conspiracy to launder drug proceeds and cooperated with the government. ZAMBRANO remains a fugitive because of a lack of a viable extradition agreement and cooperation between the United States and Venezuela.

USAO00000054



F.    DEA Miami/U.S. Treasury Investigation into HENRY GUBEREK.

69.    On July 9, 2013, an indictment was returned in the U.S. District Court for the Southern District of Florida in criminal case number 13-20497-CR charging four defendants, including HENRY GUBEREK GRIMBERG and his father ISAAC PEREZ GUBEREK RAVINOVICZ, with conspiracy to launder the proceeds of drug trafficking, in violation of 18 U.S.C. § 1956.  The investigation that led to the indictment was conducted by the DEA in Miami

and the U.S. Department of the Treasury. As part of the investigation, on the same day, the Treasury Department's Office of Foreign Asset Control ("OFAC") designated GUBEREK and twenty-nine other individuals, entities, and companies located in Colombia, Panama, and Israel as "Specially Designated Narcotics Traffickers" ("SDNT's") pursuant to the Foreign Narcotics Kingpin Designation Act ("the Kingpin Act"), 21 U.S.C. § 1901-08. The result of the designation under the Kingpin Act is to legally prevent U.S. individuals and entities from conducting business and transactions with SDNT's without specific authorization from the Treasury Department.

70. As further described below, three of the entities specifically designated as SDNT's are companies that both HENRY GUBEREK and COVELLI used to launder drug money: SBT S.A., C.I. DEL ISTMO S.A., and INDUITEX. In September 2010, during DEA undercover Operation Fire and Ice, the DEA laundered approximately $326,000 in drug money into the SBT S.A. and C.I. DEL ISTMO S.A. accounts. As also further detailed below, both COVELLI and GUBEREK cooperated with the DEA and independently provided information that implicates SALOMON BENDAYAN in the laundering of drug proceeds through a trade-based money laundering scheme.

71. Furthermore, bank records from between 2008 and 2009 corroborate a connection between BENDAYAN's suspected money laundering associates, LUSTGARTEN and SOTO, and GUBEREK's companies that are now OFAC-designated, SBT S.A., CI DEL ISTMO S.A., INDUITEX LTD, and INDUITEX SA. Between March 31, 2008, and March 19, 2009, these companies associated with COVELLI and GUBEREK's trade-based money laundering scheme wired a total of more than $58 million to LUSTGARTEN and SOTO's bank account at Bank of America described above, the Rosemont Q account at Bank of America in Miami listed as d/b/a Clifton Capital.

31

USAO00000056

# WIRETAP INVESTIGATION IN ARGENTINA

A.    Background of DIEGO LAOUI Investigation



74.    As further described below, [redacted] s simultaneous contact with [redacted] d to an ongoing wiretap investigation of [redacted] n Argentina that is being conducted by Customs officials in Argentina.   One of the targets intercepted during the [redacted] wiretap investigation in Argentina is SALOMON BENDAYAN, the user of the Target Telephones.

B.    September 2013 Surveillance of [redacted] in Boston

75.    On Sunday, September 9, 2013, Special Agent Lavoie and I learned that one of



33

USAO00000058

Boston.

C.     ████████ Wiretap Investigation in Argentina

78.     In coordination with HSI agents in Boston, in July 2013, HSI agents in Buenos Aires, Argentina, along with law enforcement agents in Argentina from *Dirección General de Aduanas* (Argentina Customs), initiated an investigation of ████████ Shortly after the investigation began, investigators learned that ██████ had an export company known as " ████ SA" in Buenos Aires and that ████ frequently traveled to Uruguay on private jets.   Later in the investigation, Argentina Customs officials identified another import/export company that ████ uses (which is owned by ███████████████ " which is involved in the import/export of bananas.   In August 2013, HSI agents learned from Argentina Customs officers that LAOUI was residing at Juana Manso, 1150 Puerto Madero, Buenos Aires, which was owned by ███████████ DOB: 8/13/70), who Argentina Customs officers arrested in 2004 for drug trafficking and money laundering.   In 2004, ███████████ was the subject of an Argentinean and DEA law enforcement investigation that resulted in the seizure of 187 kilograms of cocaine, and the seizure of ███████████ roperties in the Dominican Republic.   The case against ███████████ Argentina ultimately was dismissed, although Argentina Customs officials believe it was due to public corruption in Argentina.

79.     In September 2013, in coordination with U.S. law enforcement agents from HSI, Argentina Customs officials began a wiretap investigation into the money laundering activities of ███████████████████████ and others, including ███████████████ in case (*causa*) number 1603/2013.   During the investigation, Argentina Customs officials received authorization from a judge in Argentina to intercept particular phones of ████████ nd his associates in Argentina and to conduct a money laundering investigation.   On a regular basis, Argentina

34

USAO00000059

Customs officials have shared the results of their investigation with HSI Special Agents stationed in Argentina who are native Spanish speakers.

80. On September 9, 2013, Argentina Customs officials advised HSI agents in Buenos Aires that ███████ was in frequent contact with ███████████████████ ██████████████████████ and Target Subject C ███████████ ████████████████ regarding the movement of millions of U.S. dollars. As described above, in June 2013, CHAMAS's associate, ███████████████████ was in telephone contact with both ████████████████. According to Argentina Customs officials, LAOUI and his organization are involved in buying bonds in Argentina called "*9 de Julio* (July 9th)" bonds that are worthless in Argentina, but get paid out in the United States thereby "*blanqueando*" (whitening) the money. The participants in the conversations with LAOUI also talked about using bank accounts in Zurich and "Liberty 5" bonds in Mexico. Argentina Customs officials also advised that ██████ and his associates frequently use Skype to communicate, but they had an issue with "Salomon" and kicked him off a Skype conversation because "Salomon" was talking too openly (about illegal activity) in the group Skype conversation.

*Identification of SALOMON BENDAYAN*

81. On September 29, 2013, Argentina Customs officials intercepted a call between ████████ and a male later identified as SALOMON BENDAYAN, who was using Venezuelan phone number 58-412-219-1525. During the call, BENDAYAN advised ██████ that the meeting would take place at the Hilton in Buenos Aires the next day on September 30, 2013. According to records maintained by DHS, BENDAYAN arrived in Buenos Aires on September 30, 2013, on a flight from JFK International Airport in New York.



35

82.     On October 1, 2013, Argentina Customs officials conducted surveillance of LAOUI and followed him to the Hilton in Buenos Aires where LAOUI met with BENDAYAN. At 9:20 a.m., Argentina Customs officials observed BENDAYAN board a private charter plane (#LVBAW) destined for Uruguay.   BENDAYAN was accompanied by several males including two men from Colombia, ████████████████████████████████████ and ████████████████████████████████████   As further described below, on November 26, 2013, investigators in Colombia intercepted a call between BENDAYAN and ███████ about ██████   After the trip to Uruguay, BENDAYAN traveled to Sao Paulo, Brazil.   Prior to going to Brazil, Argentina Customs officials intercepted a call in which ████████ old BENDAYAN to travel to Brazil to complete the "business."   BENDAYAN left Sao Paulo on October 4, 2013, on American Airlines Flight 950 for New York.

83.     BENDAYAN was born in Morocco and has dual citizenship in Morocco and Canada, but he resides in the United States and has legal permanent residency in the United States. BENDAYAN is believed to have an apartment in Aventura, Florida, and an apartment in New York located at 400 Avenue U, #307, Brooklyn, New York.   BENDAYAN flew to Buenos Aires from New York.   Prior to arriving in Buenos Aries, over the past year, BENDAYAN had also traveled to Panama City, Caracas, Cartagena, Montevideo, Costa Rica, Cancun, Vancouver, Tel Aviv, Zurich, Frankfurt, and Hong Kong.

*Intercepted Calls with Target Telephone #1 in Argentina*

84.     In October 2013, Argentina Customs officials intercepted several calls between LAOUI and BENDAYAN.   During these calls, BENDAYAN was intercepted using a New York

36

USAO00000061

City area AT&T Wireless cellphone assigned phone number (917) 714-8868, which is Target Telephone #1. According to records from AT&T Wireless, Target Telephone #1 is subscribed to PILOT HOLDINGS INC C/O J CALVO, with an address of 400 AVENUE U, APT 307, BROOKLYN, NY, which is BENDAYAN's residence in New York.

85. On October 9, 2013, at 5:39 p.m., the Argentina wiretap intercepted a call to ▇▇▇ from BENDAYAN who was calling from phone number (917) 714-8868, which is Target Telephone #1. During the call, ▇▇▇ referred to BENDAYAN as "Salo" and BENDAYAN referred to ▇▇▇ At the beginning of the call, ▇▇▇ told BENDAYAN that he was located near "San Paulo," Brazil. BENDAYAN paused and said, "…my friend is going to be ready to meet tomorrow." ▇▇▇ responded, "All set. I will give you the address where you are going to give it . . . No but they want…they want…yes but they want a phone number where they can call first in regards to me." Moments later, ▇▇▇ asked, "Can I give them your number?" BENDAYAN said, "Yes give them my number, give them my number . . . Give them my number. Yes." ▇▇▇ answered, "*Okay okay* that you are associated with me. You don't tell him that you are in San Paulo, only that…and where is it they need to go. Okay . . . Just like how we did the operation of [PH] 'Cabo.'" ▇▇▇ continued, "*Okay* then we are going to…eh I am giving him your number right now. *Okay?*" BENDAYAN said, "Go ahead, go ahead."

86. In this call, investigators believe that ▇▇▇ and BENDAYAN were discussing a meeting that BENDAYAN was going to have soon with some unidentified individuals; that ▇▇▇ was going to give these individuals BENDAYAN's phone number; and that reference to "operation of Cabo" referred to a prior money laundering transaction that BENDAYAN will soon be discussing with these unidentified individuals.

37

USAO00000

87. On October 15, 2013, at 1:34 p.m., ▓▓▓▓ received an incoming call over phone number 54-911-5419-2026 from SALOMON BENDAYAN who was calling from Target Telephone #1. At the beginning of the call, BENDAYAN told ▓▓▓▓ "Everything good [U/I] they are going to be giving that [U/I] . . . Is that fine?" BENDAYAN continued, "No okay so then I will call you…look…let's do, let's win a little bit of money this week then . . ." ▓▓▓▓ interrupted, "Go ahead. Start building everything and then pass me when you can the [U/I]." BENDAYAN responded, "Yes, yes, yes, yes but we are going to do the operation (the money laundering transaction) the way we talked about it." ▓▓▓▓ and BENDAYAN talked over each other and ▓▓▓▓ said, "That, don't worry about it. I will have it . . . If everything comes out good…if everything comes out good, this is weekly. *Okay*?" BENDAYAN said, "Don't worry go ahead." And the call ended.

88. During this call, investigators believe that ▓▓▓▓ and BENDAYAN discussed a money laundering operation that they would be conducting soon with the same unidentified individuals referenced above. In the call, BENDAYAN said that they will be making money, and LAOUI said that, if the transaction goes well, they will be able to conduct the operation on a weekly basis.

89. On October 30, 2013, at 11:36 a.m., ▓▓▓▓ received an incoming call over phone number 54-911-5419-2026 from SALOMON BENDAYAN who was calling from Target Telephone #1. Near the beginning of the call, ▓▓▓▓ old BENDAYAN, "I called you…I called you to all your cellphones and no answer." BENDAYAN answered, "I know…what is happening is that I am working here as well and with the time difference." BENDAYAN told ▓▓▓▓ hat he would send ▓▓▓▓ the phone numbers, but that he would be traveling to Hong Kong on Sunday. In particular, BENDAYAN said, "I am I am sending you... I am going to send you right

38

now so you can...[PH] Israel's cellphone is functioning perfectly .. Until Sunday because then I will be leaving to [PH] Hong Kong." ▮▮▮▮ responded, "Ah *okay* that's fine, that's fine ... You are leaving...that's where they sent everything ... They sent you everything. I will explain to you what happened there. They were waiting for the invoices of [U/I]. [PH] Josephina was waiting for the...No. The invoices of [U/I] to send you directly of the deposit the reception there. It had to be sent somewhere else, since you weren't available." BENDAYAN said he understood and then asked, "Listen...when am I going to receive the total?" LAOUI said, "Today, today, today." BENDAYAN asked again, "When am I going to receive the total?" ▮▮▮▮ responded, "Today you will receive the total ... What is happening is that ... What is happening is that they are sending them domestic. Do you understand me?" BENDAYAN responded, "We will, we will discuss the counts tomorrow *okay*?" ▮▮▮▮ said, "Of course, and he is sending them domestically, do you understand? And the invoicing of the beginning...So then you will receive it all at once [U/I] do you understand ... That is...that is what I need to clarify with you so then I can start building, or they can..." BENDAYAN answered, "No, no, no, we are going to talk tomorrow. Let's talk tomorrow with patience please. Let's talk tomorrow patiently so we can organize this well because the people want...there is a lot, lot more, do you understand me?" Moments later, BENADYAN said, "I want to...I want to get together...I want to close this operation with you." ▮▮▮▮ said, "All I am going to do for that is leave you a deposit like how I did with that last time." BENDAYAN responded, "Don't worry ... No worries we will talk, we will talk soon." And the call ended.

90.     During this call, investigators believe that BENDAYAN and ▮▮▮▮ discussed a money laundering transaction, and possibly a pick-up of money. BENDAYAN asked ▮▮▮▮ for the total amount of funds collected ("When am I going to receive the total?"). BENDAYAN said

39

that he needs to know the total amount of money involved so he can "close this operation," *i.e.*, the money laundering transaction. BENDAYAN also said that he was traveling to Hong Kong and would be talking to "Josefina" (believed to be Josefina Wannoni, the co-director of A&L Services in Hong Kong along with EDUARDO SOTO).

91.     Based on pen register data and telephone toll records, two of BENDAYAN's most frequent telephone contacts are MARTIN LUSTGARTEN and 

LUSTGARTEN. According to HSI agents in Hong Kong, there is an active Hong Kong company called A&L Services Limited, formerly known as Arbitrage and Lending Ltd, which was incorporated in October 2008. The registered directors are ███████████████ and ███████████ Investigators believe that BENDAYAN's reference to "Josefina" in the phone call described above was a reference to Josefina Wannoni of A&L Services Limited, who is ███████ mother.

92.     On November 1, 2013, Argentina Customs officials intercepted a call between LAOUI and a male in Colombia referred to as ███████████████████ ███████ introduced himself to ███████ s "Salomon's friend." During the call, ███████ and ███████ discussed the transfer of $496,200 that ███████ made to ███████ in Bogotá, Colombia.

93.     On December 9, 2013, Argentina Customs officials intercepted another call between ███████ and BENDAYAN in Argentina with BENDAYAN using Target Telephone #1. At the beginning of the call, ███████ asked BENDAYAN, "I ask you a question, are you with ███████ Because I believe that he is misinterpreting something, ███████████████ ███████████████████████████ and I don't know . . . I don't want to have any problems

40

with anybody." BENDAYAN responded, "I am in a meeting, and I am going to see him, Andres, in two hours, ███████ ███████ then responded, "I want, because I don't want to communicate too much via this (meaning, that ███████ did not want to talk over the telephone). What I told him was, I had the possibility of an operation (money laundering transaction) where I have it there; they were asking me to receive important money, let's say five weekly there in the accounts ($500,000 weekly into bank accounts). I don't want to send you from any account for you to receive there. That's why I sent you the accounts, where I receive them in my accounts and then I pass them to yours, it's for security so I don't send you from any account, understand? To preserve you not me, because I cannot send you from any." Moments later, ███████ continued, "That's why I passed you the accounts and I am asking for the authorization of the 'templey' [PH] to your account so they can send me. The moment I receive in my account I will be passing them and giving them to you. Andres tells me that he wants to have the money first before receiving the money here. That's fine, no problem. You are in between, no problem. It's not a problem of credit." ███████ continued, "It's that I don't want them to put something to you and then you ask me later, from what cable did you send me, understand? I don't know them." BENDAYAN said, "Dieguito relax, don't worry. I am going to talk with him in two hours and I will call you. Okay." ███████ responded, "That's fine. But that's what I want you to have clear. That you receive a deposit from a so and so and that I don't know him. I see that the other ones come from the same account. They always come from the same." ███████ assured BENDAYAN that he works in an organized manner to which BENDAYAN responded, "███████ there's no problem of trust here, what's happening is that he's handling that with the Venezuelans. You understand, relax." BENDAYAN said he would talk to him and the call ended.

41

94. In this call, ███████ first asked BENDAYAN if he was going to see ███████ Agents believe that this is a reference to either ██████████████████████████ Agents also believe that ███████ is talking to BENDAYAN about a future money laundering operation involving $500,000 on a weekly basis ("let's say five weekly there in the accounts") involving "important money" but that ███████ does not talk too much over the phone ("because I don't want to communicate too much via this"). ███████ also told BENDAYAN that he did not want to send the money from his own accounts for "security" reasons, and instead would send BENDAYAN information about the accounts that he would use ("it's for security so I don't send you from any account, understand?"). In this part of the call, agents believe that ███████ ought to layer the transaction through the use of different accounts to conceal ███████ involvement in the transaction.

95. More recently, on February 10, 2014, wire intercepts in Argentina revealed that ███████ has become aware of the wiretap investigation in Argentina and knows from some corrupt source the name of the particular judge who had authorized the wiretaps on his phones as well as the case number.

*Intercepted Calls with Target Telephone #1 in Colombia*

96. Following the October 1, 2013 meeting that ███████ had with BENDAYAN in Argentina and BENDAYAN's trip to Uruguay with ████████████████ members of the Colombian National Police ("CNP") in Colombia initiated an investigation into ██████████████████ in Colombia. The investigation involves wiretaps authorized pursuant to Colombian law. On November 26, 2013, members of the CNP intercepted a call between BENDAYAN (using Target Telephone #1) and ████████████████

42

97.     On November 26, 2013, at 11:36 a.m. (Bogota time), Colombian investigators

intercepted a call over ▮▮▮▮▮▮ cellular phone number 57-310-212-3164, from

BENDAYAN who was calling from Target Telephone #1.   At the beginning of the call,

BENDAYAN told ▮▮▮▮▮▮ that he had trying to contact ▮▮▮▮▮▮▮ and had called

him through Skype.   ▮▮▮▮▮▮ told BENDAYAN the meeting went very well; that he told

"Juan Camilo" to get the cellphone; and that he told this person (possibly "Juan Camilo") that "I

will keep helping him, I will keep respecting him, and it went well."   ▮▮▮▮▮▮ continued

that, "I told Alberto that I had put him to work as partner [U/I] like to help you understand?   He is

not a cost to me. And he is going to bring me some things so you and I can discuss them over there.

It's good, it went good."   Moments later, BENDAYAN asked, "And what does he... what does he

tell you about Venezuela? The situation is very delicate." ▮▮▮▮▮▮ agreed that the situation

was very delicate, but stated, "They were doing reductions in the company, but that that is

normal."   A short time later, ▮▮▮▮▮▮ told BENDAYAN, "The whole world is receiving

them and having revisions and it is normal. No, he wants to open Peru. That I am...he wants to

open Peru, he has experience in Peru. Eh... with ▮▮▮▮▮▮ it went well because he gave me

more insight ... so basically we can go to one and buy the expensive meat, and to others some

cheap meat no? So we can do a mix there. With Diego it went good so you can see I have a lot,

from 7:00 a.m. he is writing to me and he is like a light there." ▮▮▮▮▮▮ and BENDAYAN

both confirmed that they and ▮▮▮▮▮▮ understand one another now and understand the

rules.   ▮▮▮▮▮▮ said that he (▮▮▮▮ "has just liquidated it."   BENDAYAN asked, "And

why, is he playing is... he playing... with that?" ▮▮▮▮▮▮ replied, "But he doesn't owe

anymore right? For real he doesn't owe much. I calmed down a bit with that."   A short time later,

BENDAYAN confirmed, "Yes we lost money, we lost money. That's the truth." ▮▮▮▮▮▮

43

USAO00000068

and ▆▆▆▆▆▆ discussed how they needed to speak clearly to him (LAOUI). ▆▆▆▆▆▆
then told BENDAYAN, "But I will bring you some things that are going to be of good value to you over there. You hear me? Real good. They are going to be really good. With precious rocks. You hear me? Listen, you save yourself…"

98.      ▆▆▆▆▆▆ then changed the subject and said, "Listen that is horrible . . . Yes they already locked up and incarcerated Pedro Rincon eh… but what is happening is that the *'Molina's'* are left in more of a feud now. He dropped things down a notch but they are still at war. The war is there." BENDAYAN asked, "That is good for us?"   ▆▆▆▆▆▆ responded, "I don't think so, I don't think so."   ▆▆▆▆▆▆ and BENDAYAN agreed that they needed to wait to for the war to die down and until the smoke clears.   BENDAYAN then reassured ▆▆▆▆▆▆ that, "Look at the end of the day, we have the papers" and said, "Those papers are irrefutable correct?"   ▆▆▆▆▆▆ agreed that they needed to be patient and stated, "It's all about patience, like how we did with…with…Juan Mario we had patience and giving him . . . And giving him…" BENDAYAN explained, "What needs to happen, what is going to happen, is that if we aren't going to sell right now, I have to take that off my name." A short time later, BENDAYAN suggested to ▆▆▆▆▆▆ "What I think…maybe you can talk to Wilmer and put some pressure on him . . . And take that off my name now because it's urgent." BENDAYAN indicated that he would put it under the name of "Aerotech," but then stated, "I… will put it under the name of a *holding* in Hong Kong like that…under the name Julian and it is all set."

▆▆▆▆▆▆ and BENDAYAN then started talking about "Claudio" (who is believed to be ▆▆▆▆▆▆. BENDAYAN said, "Isaac told me…Isaac, Isaac (who is believed to ISAAC COHEN), is after him because we are not pardoning anything." BENDAYAN further explained, "I already informed him (▆▆▆▆▆▆ that there was paperwork

44

that needed to be done, and he told me he gladly would help. I don't know what they told him yesterday, but I got him off my back. Yeah I think that now, now I have shaken him off me completely." ███████ and BENDAYAN then agreed to talk again soon and the call ended.

99. . Investigators believe that, during this first part of the conversation, ███████ and BENDAYAN were talking about ███████ and that ███████'s reference to "expensive meat" and "cheap meat" was a coded reference to the purchase and sale of U.S. dollars on the black market (which is typically derived from drug trafficking). ███████ and BENDAYAN then talked about how they lost money, and that ███████ had to liquidate assets. During the second part of the conversation, investigators believe that ███████ discussed the arrest of an unidentified individual referred to as "Pedro Rincon" ("Listen that is horrible . . . Yes they already locked up and incarcerated Pedro Rincon") and discussed moving an asset (possibly a bank account) into the name of a Holding Company in Hong Kong to avoid using BENDAYAN's name (in order to conceal the ownership of the funds and avoid seizure of the funds, "I… will put it under the name of a *holding* in Hong Kong like that…under the name Julian and it is all set"). Finally, ███████ and BENDAYAN discussed a debt that is owed by a male believed to be ███████. In the call, BENDAYAN indicates that he spoke to a male I believe to be ISSAC COHEN (who is one of BENDAYAN most frequent contacts over both Target Telephones) that they are not going to forgive the debt ("we are not pardoning anything").

100. In early February 2014, Colombian law enforcement officials intercepted a call between ███████ and a male in Florida named ISAAC COHEN who was using Florida phone number (786) 286-6181. During the call, agents believe that COHEN talked to

45

URICOCHEA about the transfer of approximately $500,000 in Colombia via a wire transfer because the exchange rate of Colombian pesos to U.S. dollars was 2,050 pesos/$1 U.S. dollar. COHEN further indicated that he would be traveling to Bogota around February 17, 2014 to meet URICOCHEA.

D.    DEA Miami Investigation into SALOMAN BENDAYAN's Florida Companies

101.    In addition to the above, I am also familiar with a DEA investigation in Miami targeting SALOMON BENDAYAN and his brother DAVID BENDAYAN and the various shell companies with which BENDAYAN is associated in Florida and New York, including companies under the name of SALOMON BENDAYAN's brother DAVID BENDAYAN. According to publically available records from Florida's Secretary of State, Division of Corporations, SALOMON BENDAYAN is the principal director of several Florida corporations, including Univex Trading Group LLC; Solid Trading Group LLC; and Gemworks Inc. The business addresses for Univex Trading Group and Solid Trading Corp is 3531 Griffin Road, Miami, Florida, which is the address for the law firm Hagen & Hagen, the registered agent for the corporations. DEA agents in Miami have conducted surveillance of the Hagen & Hagen law firm and have observed individuals delivering suspicious packages, believed to contain cash, being brought into the business. The business address for Gemworks Inc. is 2020 N. Bayshore Drive, #3210, Miami, Florida, which appears to be a condominium in a residential apartment building in Miami (Paramount Bay Condos).

102.    In addition to Univex Trading Group LLC and Gemworks, investigators also have received records regarding a New York State Corporation called REPYPSA, LLC. In 2010, BENDAYAN, along with JOSEPH CALVO and PAMELA LEHBAR were the signatories for two different JP Morgan Chase checking accounts for REPYPSA in New York. A review of the bank

46

records for REPYSA for late 2010 revealed account activity that was consistent with a trade-based money laundering scheme. Within a three month period, the two accounts received more than $8 million in wire transfers from Ecuador and Venezuela, and then wired out more than $7 million to "L SERVICES" and "GLOBEX CAPITAL" in Hong Kong. The accounts were closed by the bank in mid-2011 because the purported business of REPYSA in Ecuador and in New York could not be explained.

103. A preliminary financial investigation also connected BENDAYAN to a suspected trade-based money laundering scheme involving "FARLEY TRADING CORPORATION," a Panama Corporation two of FARLEY's accounts at Bank Hapoalim in Aventura, Florida the largest bank in Israel with branches in New York and Florida. SALOMAN BENDAYAN and his father Mair Bendayan were listed as being the beneficial owners of the two bank accounts. According to bank records, the business purported involved the purchase of clothing in China and Colombia, through a company in Venezuela called DAYANTEX, C.A.,[8] that FARLEY then sold in Mexico and Venezuela. Within a two-month period in April and May 2009, however, the FARLEY accounts received more than $2.5 million in wire transfers from several business entities in Mexico that appeared to be third party payments unrelated to any clothing business. While invoices were provided to the bank in an attempt to corroborate the purchase and sale of clothing, the invoices did not match the names of parties in Mexico that sent the wires to FARLEY's account in Florida.

104. In December 2013, through public record and internet searches, investigators located a company website for "BEDROCK HOLDINGS." The listed point of contact for Miami

---

[8] According to records from the Florida Secretary of State, Division of Corporations, there is also a Florida corporation called "Dayantex Inc" in Aventura, Florida. The sole director of the Florida Corporation is DAVID BENDAYAN, SALOMON BENDAYAN's brother.

USAO00000072

was ISAAC COHEN, at phone nu⟨...⟩alled this

phone number from a blocked pho⟨...⟩with an

outgoing voicemail message indicat⟨...⟩While the

Bedrock Holdings website was availa⟨...⟩There are

two other points of contact listed in the⟨...⟩e number,

but with different extensions:  Ellen C⟨...⟩A

search of records from the New York St⟨...⟩

"BEDROCK HOLDINGS" corporations⟨...⟩ _LLC" and "BEDROCK

HOLDINGS AMERICA LTD."  BEDROCK HOLDINGS AMERICA is the listed subscriber for

BENDAYAN's second cellular phone described herein, Target Telephone #2.

*(handwritten note:)* Sept 2013 Argentine Customs / Oct 2013 Colombian National Police / LAOUI - Argentina 2010 / SRFWAN MKPARAT... / A&L Seoury limited -

## COOPERATING SOURCES OF INFORMATION

105.    During the investigation, HSI and DEA agents have received information from four

different cooperating defendants and three different cooperating sources of information. Two

cooperating defendants (referred to as CD-1 and CD-2) were involved in a trade-based money

laundering scheme in Colombia.   Both CD-1 and CD-2 provided information about SALOMON

BENDAYAN that implicates BENDAYAN in the same money laundering scheme. The

information that CD-1 and CD-2 provided has been corroborated by other evidence in the case.

Both CD-1 and CD-2 independently provided information which was corroborated by bank

records from Bank of America. The second and third cooperating defendants, CD-3 and CD-4,

provided information primarily about the historical money laundering activities of ███████

███████████████████

106.    In addition to these four cooperating defendants, agents have also received

information from four different sources of information (SOI-1, SOI-2, SOI-2, and SOI-4).   None

48

USAO00000073

of these individuals is a registered government informant, but each has provided information to investigators regarding some of the targets of the investigation, namely CHAMAS and BENDAYAN. With the exception of information provided by the fourth source (SOI-4), the information that each of these sources has provided has been corroborated by other evidence in this case.

107.    In the following paragraphs, I have summarized most but not all of the information that these cooperating defendants and sources of information have provided to law enforcement agents. These below summaries are based on my own participation in interviews of CD-3 and CD-4 as well as SOI-1 and SO1-2; my review of interview reports; and my conversations with the law enforcement agents who participated in these interviews and the related investigations.

*Cooperating Defendant No. 1*

108.    Cooperating Defendant No. 1 ("CD-1") is⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ In November 2013, DEA Agents from the DEA Miami Field Division interviewed a cooperating defendant ("CD-1"). CD-1 is currently charged with money laundering offenses in an indictment returned in the Southern District of Florida, but is not incarcerated and is currently outside the United States. CD-1 provided information in hopes of obtaining leniency in sentencing. As further described below, CD-1 was involved in a trade-based money laundering scheme that operated in Colombia, Venezuela, Panama, and Hong Kong. CD-1 agreed to cooperate with U.S. law enforcement because of his pending criminal charges. CD-1 has retained counsel in the United States, has indicated an intention to surrender to U.S. authorities but has not yet done so, and has not yet signed any type of plea agreement. The information that CD-1 has provided has been corroborated by information from another cooperating defendant in this investigation, CD-2.

49

USAO00000074

109.    CD-1 explained that, between 2007 and 2009, CD-1 was involved in a trade based money laundering scheme in Colombia that CD-1 and his associates referred to as "Plan Viejo." CD-1 participated in the scheme along with several of CD-1's family members who also lived in Colombia, ANDRES COVELL-CADAVID, a Colombian male from Medellin, as well as several Venezuelan males, including SALOMON BENDAYAN.    CD-1 also told agents that COVELLI had a partner named FREDDY GUARIN, and explained that COVELLI and GUARIN had a *casa de cambio*/money exchange business in Cúcuta, Colombia.

110.    The scheme arose out of the strict currency controls in place in Venezuela.    In general terms, the scheme involved importing T-shirts, textiles, and other fabrics from China; falsely claiming that the goods were manufactured in Colombia rather than China (to avoid import tariffs); falsifying invoices to grossly inflate the actual number of items imported in Venezuela; and selling U.S. dollars from the black market in exchange for Venezuelan Bolivars.    The DEA and U.S. Treasury Department investigation revealed that millions of U.S. dollars that were claimed to be from the sale of legitimate goods (textiles, t-shirts, and fabrics) were in fact the proceeds of drug trafficking in the United States.

111.    CD-1 explained that COVELLI and CD-1 used COVELLI's company in Colombia, C.I. DEL ISTMO S.A., to export t-shirts to Venezuela and receive U.S. dollars in Colombia.[9]    CD-1 explained that while they had about 20,000 to 30,000 t-shirts in stock, on paper they claimed to have about five times that amount.

---

[9]During DEA Boston investigation Operation Fire and Ice, on September 1, 2010, DEA undercover agents picked up $367,845 in drug proceeds in Chicago, Illinois.    After the pickup, the main defendant, ALDO FERNANDO GUERRERO-CLAVIJO, instructed the main UC agent to wire transfer the money to several bank accounts in the United States, including an account at Citibank N.A. in New York under the name C.I. DEL ISTMO S.A.    Following these instructions, on September 3, 2010, the DEA wired $81,292 in drug money to this accounts under the name C.I. DEL ISTMO S.A.

112. Shortly after the scheme began, COVELLI introduced CD-1 to SALOMON BENDAYAN in San Antonio, Venezuela. At the time, BENDAYAN sold fabric in Venezuela. CD-1 explained that BENDAYAN saw an opportunity with C.I. DEL ISTMO: they could smuggle fabric into Colombia (that originally came from China); create fraudulent invoices to make it appear that the fabric was purchased in Colombia; inflate invoices; and export the fabric to Venezuela. CD-1 also explained that, in addition to t-shirts, CD-1 and BENDAYAN were also involved in importing textiles and fabric into Venezuela. Similar to the t-shirt scheme, BENDAYAN claimed that the fabric and the textiles were manufactured in Colombia (but in fact were manufactured in China and imported into Colombia). The scheme involved inflating invoices to justify the need for more U.S. dollars and using straw owners of various *CADAVI* licenses in Venezuela. The scheme allowed the participants to obtain a better exchange rate from *CADAVI* based on the volume or exports, which was falsely inflated.

113. CD-1 stated that BENDAYAN was in charge of procuring the funds for the operation, and that it was BENDAYAN who obtained the bank accounts in Hong Kong for the operation. According to CD-1, BENDAYAN opened banks accounts at HSBC in Hong Kong for CD-1 and his family run operation. CD-1 further told agents that the accounts under the name "TIMPSON & UNIVEX" were opened to move (launder) money, and stated that CD-1 believed that BENDAYAN knew the purpose of opening up the accounts was to launder the money. According to CD-1, it was BENDAYAN who suggested that he (BENDAYAN) should open up the accounts for safety and to make the accounts less traceable (*i.e.*, conceal the ownership of the money).

114. CD-1 described BENDAYAN as "the person" who had the relationship with the Venezuelans, namely MARTIN LUSTGARTEN and EDUARDO SOTO. According to CD-1, LUSTGARTEN and SOTO had a *casa de bolsa* in Venezuela which was eventually shut down by

51

USAO0000007₆

the Venezuelan government. CD-1 said that he met with LUSTGARTEN and SOTO on few occasions at CD-1's office in Bogota.[10]

115.  In addition to BENDAYAN, CD-1 identified other participants in "Plan Viejo," including BENDAYAN's brother DAVID BENDAYAN ("D. BENDAYAN") and GUSTAVO SALCEDO. CD-1 said that D. BENDAYAN ran the commercial side of BENDAYAN's fabric business, and stated that he had personally met D. BENDAYAN. In addition to the fabric business, CD-1 told agents that D. BENDAYAN had contacts with a company in Venezuela called "GRAFFITI," a large chain clothing store in Venezuela that was importing garments from China. Instead of bringing the goods directly into Venezuela, D. BENDAYAN brought the garments through Colombia using INDUITEX and made a profit from *CADAVI* (by inflating the volume of imports, and bringing in extra U.S. dollars from the black market). CD-1 said that D. BENDAYAN had little knowledge of the actual garment/fabric industry.

116.  According to CD-1, in 2009, the *CADAVI* market shut down due to a problem that arose between Colombia and Venezuela. BENDAYAN told CD-1 that the shutdown was not his fault or issue. As a result of this shutdown, however, BENDAYAN owed millions of U.S. dollars to various people. CD-1 and CD-1's brother attempted to make up the debt by dealing with the free trade zone in Panama, but fell further into debt. CD-1 ended up owing millions of U.S. dollars, including approximately $30 million to individuals in Panama. CD-1 stated that CD-1 owed about $1 million to COVELLI.

---

[10] As further described above, in March 2009, the DEA executed a series of seizure warrants at Bank of America in Miami related to the then existing Venezuelan parallel currency market known as the *"Permuta."* One of the accounts that DEA seized was LUSTGARTEN and SOTO's account, which was listed under the name Rosemont Q Corporation, d/b/a Clifton Capital and Arbitrage & Lending Inc. The DEA seized a total of $3,737,662 from the two bank accounts and eventually forfeited $575,380 from the accounts, because the accounts were involved in the operation of running an unlicensed money remitter business. In March 2010, LUSTGARTEN began cooperating with DEA because of the seizure and after being approached by associate in Venezuela to launder funds from Iran to Venezuela through U.S. banks.

USAO00000077

117.    In January 2010, CD-1 began receiving threats regarding the debts that CD-1 owed, including from a person CD-1 knew as "ALEJO." CD-1 tried to explain to ALEJO that the money was tied up with *CADAVI* and that they needed time. ALEJO nonetheless came back each week for a month to Bogotá to collect money from CD-1. Eventually, CD-1 turned over the ownership to a piece of property in Colombia worth about $500,000. In an effort to pay off the debt, CD-1 then agreed to start picking up drug money for ALEJO. CD-1 told ALEJO that CD-1 could pick up cash in the Dominican Republic or Mexico. CD-1 admitted that, after a certain point, CD-1 knew that the cash CD-1 was picking up in the Dominican Republic was from drug trafficking.

118.    CD-1 explained that CD-1 had one of CD-1's associates pick up the money in the Dominican Republic, and CD-1 provided wire instructions to CD-1's associate in the Dominican Republic. Following CD-1's instructions, the money was wired from the Dominican Republic to Colombia through accounts in Hong Kong; accounts at Citibank in New York; and accounts in Panama. On December 6, 2010, CD-1 was kidnapped in Colombia for a debt of about $4.5 million that CD-1 owed to ALEJO. After CD-1's release, CD-1 fled from Colombia to Israel. CD-1 contacted SALOMON BENDAYAN and the two met in Israel, and CD-1 explained the problem to BENDAYAN. According to CD-1, BENDAYAN told CD-1 that he would send CD-1 $1,000 to help CD-1 out, but he never did. CD-1 has not had any contact with BENDAYAN until shortly after his release.[11]

119.    When asked about the amount of money CD-1 helped launder, CD-1 admitted that CD-1 had helped launder drug money and estimated that CD-1 had laundered approximately $30 million U.S. dollars.

---

[11] It should be noted that BENDAYAN has multiple phone calls to Israel and travels to Tel Aviv, but agents have not identified the user of the phone numbers that BENDAYAN calls in Israel.

*Cooperating Defendant No. 2*

120.    Cooperating Defendant No. 2 ("CD-2") is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CD-2 was arrested in Colombia in July 2011, extradited to the District of Massachusetts in March

2012, and began cooperating shortly afterwards at the end of March 2012.    CD-2 was initially

reluctant due to fear of potential harm/retaliation, and at first had a difficult time admitting that

he knew the money he was helping move was from illegal drugs, at least through willful

blindness.    However, by August 2012, CD-2 was fully cooperative, admitted that he knew the

money was from illegal drugs (and that he never asked questions about the source of the funds

because he already knew the answer).    CD-2 pled guilty to conspiracy to launder the proceeds

of drug trafficking in December 2012, and in November 2013, was sentenced to a term of

imprisonment of 86 months, after the government filed a 5K1.1 motion for reduction of sentence

for substantial assistance.

121.    CD-2 told agents that in or around 2007 in Colombia, CD-2 began working with

FERNANDO GUIO CABRERA.    CD-2 explained that GUIO had previously worked as a

currency broker.    GUIO and COVELLI both created a company known as C.I. FERAN LTDA and

obtained licenses from the Colombian government to help buyers in Venezuela purchase shipments of

textiles, roof tiles, and other materials that were imported into Venezuela.    The buyers in Venezuela

could not purchase the materials with Venezuelan Bolivars; they needed U.S. dollars.

122.    CD-2 explained that through *CADAVI*, the official exchange rate was 4.8 Bolivars per

U.S. dollar, but that the black-market rate (what CD-2 described as the "liberal" market and as "third

party payments")[12] was 8.5 Bolivars per U.S. dollar.    (In other words, individuals in Colombia paid

---

[12]In general terms, third-party payments refer to the situation where an unrelated third party to a transaction becomes
the payor for the goods or services. While there are legitimate third-party payment processors (*e.g.*, credit-card
companies), the payments by third parties that are entirely unrelated to an underlying international transaction are

54

USAO00000079

more Bolivars for fewer U.S. dollars because currency restrictions in Venezuela made it difficult to legally get U.S. dollars. Conversely, individuals selling black market U.S. dollars earned a higher return.) By 2009, CD-2 and FERAN were then able to falsely inflate the number of products they were importing. The gap or difference (what CD-2 described as the "space") permitted CD-2 and FERAN to additional U.S. dollars into Colombia, black-market U.S. dollars (that earned a higher return on the black market).

123. CD-2 stated that a problem arose in 2010 when Customs Officials in Colombia from *"DIAN" (Dirección de Impuestos y Aduanas Nacionales)* conducted a review and found that many of FERAN's purported clients did not actually exist. Around 2010, CD-2 and FERAN became involved in a similar scheme with foreign currency exchange transactions and foreign investments. The scheme involved masking incoming wire transfer of U.S. dollars as a return of foreign investments and payment for car parts that had been imported into Venezuela from the United States. Each of the incoming wire transfers was actually "dirty" money from the black market that CD-2 knew was drug money. CD-2 purchased the drug money in U.S. dollars from CD-2's co-defendants, ALVARO ARTEAGA-ESPINOZA and ALDO FERNANDO GUERRERO-CLAVIJO.[13]

124. During the investigation that led to CD-2's indictment, the main undercover agent, DEA Task Force Officer Jaime Cepero, engaged in a meeting with CD-2, ARTEAGA, and GUERRERO. During the meeting, CD-2 explained to TFO Cepero his methods for laundering money. In the same meeting, CD-2 boasted of having accounts in China that could be used to launder money. Following CD-2's arrest, CD-2 explained that he in fact did not have accounts in

___

often a sign of trade-based money laundering. *See Trade-Based Money Laundering*, www.ice.gov/cornerstone/money-laundering.htm; *Risk Associated with Third-Party Payment Processors, FINCEN Advisory* FIN-2012-A010 issued October 22, 2012.

[13]It should also be noted that both ARTEAGA and GUERRERO cooperated with the investigation and provided information about COVELLI's money laundering activities as well as their own money laundering and drug trafficking conduct. These cooperating defendants, however, do not know any of the Target Subjects in this investigation.

China, but was speaking of accounts held by the HENRY GUBEREK and ISSAC GUBREK. According to CD-2, the GUBEREK family had large textile companies in Colombia, including a company that HENRY GUBEREK owned called "Azuca-Azucita." CD-2 stated that CD-2 worked with HENRY GUBEREK for about one year starting around 2007. After a year, their business partnership broke off due to a disagreement and GUBEREK ended up owing CD-2 about $1 million. During that time, however, CD-2 said that a Venezuelan named SALOMON BENDAYAN worked with HENRY GUBEREK with a company called "Indutex." CD-2 also said that BENDAYAN also had outlets/offices in New York City.[14]

*Cooperating Defendant No. 3*



126. CD-3 pled guilty to multiple criminal charges including conspiracy to distribute marijuana, oxycodone and marijuana; conspiracy to collect through the use of extortionate means; conspiracy to impede a federal investigation; and conspiracy to launder drug proceeds. The government filed a 5K1.1 motion to reduce CD-3's sentence for substantial assistance and the Court sentenced CD-3 to a term of incarceration of 144 months. CD-3 has agreed to continue to cooperate in hopes of obtaining a further reduction in sentence. The information that CD-3 has provided to investigators about CHAMAS has been corroborated by independent evidence

---

[14]It should be noted that while the DEA Report of the interview that took place on June 26, 2012, did not include this information about BENDAYAN, TFO Cepero's typed notes included this information about BENDAYAN.

USAO00000081

including the interview of CHAMAS in December 2012, an e-mail search warrant, and information from other cooperating sources of information described herein. CD-3 is willing to testify, and has testified before the grand jury.



USAO00000082



*Source of Information No. 1*





59

USAO00000084



60



61

USAO00000086



*Cooperating Source of Information No. 2*

139.    Cooperating Source of Information No. 2 ("SOI-2") is ███████████████

who is also named as a Target Subject.   SOI-2 began providing information to U.S. law

enforcement agents in approximately March 2010.   SOI-2 is not a registered confidential

informant with any U.S. law enforcement agency, and is currently not an agent of the U.S.

government.   While SOI-2 provided pro-active cooperation to the DEA in 2010, agents believe

that SOI-2 is currently providing information to the DEA in an effort to avoid indictment by U.S.

authorities.   While SOI-2 has never admitted to laundering drug money or other illegal money,

SOI-2 is tied to suspicious multi-million dollar foreign currency transactions and "loans"

involving Venezuela and the United States.

140.    As further described above, in March 2009, the DEA in Boston seized SOI-2's

bank account.   SOI-2 retained counsel and a settlement was reached regarding the forfeiture of a

portion of the funds in SOI-2's bank account.   Following the seizure, the DEA and a financial

USAO00000087

analyst in the U.S. Attorney's Office in Boston requested documents and explanations regarding specific suspicious transactions involving specific entities, including INDUITEX LTDA, SBT S.A., and C.I. DEL ISTMO S.A.[17] In response to these questions, SOI-2 claimed that each of the INDUITEX LTDA , SBT SA, and C.I. DEL ISTMO S.A. transactions represented repayments of loans given to "DAYANTEX S.A." (As further described above, in 2009, BENDAYAN was suspected of being involved in a trade-based money laundering scheme that involved the purchase of clothing in China and Colombia, through DAYANTEX, C.A.). According to both CD-1 and CD-2, SBT S.A. was a conduit for trade-based money laundering. In September 2010, DEA undercover Operation Fire and Ice laundered drug money into the SBT S.A. account at the direction of GUERRERO. SOI-2 also identified (and bank records confirmed) one wire transfer of $60,000 from "Salomon Bendayan" as a repayment of a loan that was made to DAYANTEX. EDUARDO SOTO also provided an affidavit giving answers and explanations about specific transactions. One of the transactions involved an incoming wire transfer of $499,975 from "HOLLAND LEASING." SOTO described this transaction as a payment that Holland Leasing made on the behalf of "Salomon Bendayan," who SOTO described as the brother of David Bendayan, the principal of DAYANTEX S.A., described as one of Clifton Capital's main textile clients in Venezuela.

141. Independent of the seizure of SOI-2's bank account, in early 2010, SOI-2 made contact with investigators from the District Attorney's Office in Manhattan after SOI-2 was approached by an associate in Venezuela, REMBERTO UZCATEGUI, to help move $100 million from Iran to Venezuela through U.S. banks in violation of U.S. law and international sanctions

[17]The information that both SOI-2 ▮▮▮▮▮▮ nd SOTO provided was done through their retained counsel and pursuant to standard limited immunity proffer letter. For this reason, the government is not relying on any of the information that SOI-2 and SOTO provided to establish probable cause for either SOI-1 (LUSTGARTEN) or SOTO.

against Iran. Thereafter, in March 2010, SOI-2 began cooperating with the DEA and the District Attorney's Office in New York to target UZCATEGUI. The investigation involved SOI-2 making recorded calls to UZCATEGUI and introducing an undercover agent for a meeting in Miami that took place in April 2010. The investigation, however, did not result in any charges because UZCATEGUI indicated to SOI-2 that he believed the undercover agent might be "DEA."

142.　After the UZCATEGUI investigation, SOI-2 continued to maintain contact with DEA Special Agent Brian DeJoy in Boston. SOI-2 provided information to the DEA in Boston of the laundering activities of ERNESTO MAFFI. Independent of SOI-2's information, on June 6, 2012, MAFFI and two others were charged in an indictment in the Eastern District of Pennsylvania with conspiracy to launder drug proceeds. The case remains pending.

143.　In January 2012, while in Boston, SOI-2 provided information to DEA agents from Puerto Rico who were investigating HENRY and ISSAC GUBEREK for money laundering. During the interview, SOI-2 provided some information about HENRY and ISSAC GUBEREK, SALOMON BENDAYAN, and his former partner, EDUARDO ENRIQUE-SOTO. In particular, in January 2012, DEA agents from Boston and Puerto Rico questioned SOI-2 about his business, Arbitrage and Lending and Clifton Capital. SOI-2 explained that he was partners with EDUARDO ENRIQUE-SOTO, and that they were in the business of providing loans/financing for various companies. SOI-2 explained that he had set up corporations in China to receive loan repayments. The repayments were for companies in Colombia, including C.I. DEL ISTMO S.A. SOI-2 stated that the GUBEREK's owned C.I. DEL ISTMO as well as others in Colombia including INDUITEX.

144.　SOI-2 stated that SOTO and SOI-2 had loaned money to the GUBEREKS for their companies, C.I. DEL ISTMO and INDUITEX. SOI-2 also claimed that prior to loaning the

64

USAO00000089

money, SOI-2 and SOI-2's partners had conducted due diligence by visiting the business locations, banks, and other references. SOI-2 further stated that they ended up loaning the money to the GUBERECKS because SALOMON BENDAYAN had vouched for the GUBEREKS and their businesses and because the father, ISSAC GUBEREK, was a leader in the Jewish community in Colombia.

145. SOI-2 explained that because of SOI-2's relationship with BENDAYAN, SOI-2 would finance business BENDAYAN's transactions with the GUBEREK family at C.I. DEL ISTMO. SOI-2 said that SOI-2 would front BENDAYAN Venezuelan Bolivars that BENDAYAN would purchase for U.S. dollars at a preferential rate of 2.6 Bolivars/$1 U.S. dollar. After receiving the U.S. dollars, they would then sell the dollars at a non-preferential rate (of 4.3 Bolivars/U.S. dollar) and earn a substantial profit.

146. More recently, DEA Special Agent Brian DeJoy and SA Phillip Lavoie interviewed SOI-2 in Boston on February 7, 2014. Agents did not ask specific questions about BENDAYAN out of a concern that SOI-2 could possibly alert BENDAYAN to federal law enforcement's interest in his activities. As further described below, SOI-2 had a phone call with BENDAYAN on February 3, 2014, and then an additional call on February 12, 2014. Between February 12, 2014, and February 24, 2014, there have been at least 6 phone calls between BENDAYAN and SOI-2. Nonetheless, when asked about specific companies, SOI-2 indicated that he did still have contact with BENDAYAN because BENDAYAN owed SOI-2 millions of U.S. dollars, but had been making payments to SOI-2, but still owes SOI-2 about $500,000. SOI-2 also claimed that he was no longer partners with EDUARDO SOTO and explained that after the Rosemont Account seizures, SOI-2 had attempted to distance himself from SOTO and others whom SOI-2 suspected might be involved in money laundering. (As indicated above, there is an active Hong Kong

company called A&L Services Limited that was formerly known as "Arbitrage and Lending Ltd," which was incorporated in October 2008. The registered directors are EDUARDO ENRIQUE SOTO and Josefina Wannoni, and does not include SOI-2's name).

147. As indicated above, while SOI-2 has voluntarily provided information to the DEA and other law enforcement agents, SOI-2 (LUSTGARTEN) is currently a Target Subject of this wiretap investigation for the following reasons. First, agents believe that SOI-2 has purposefully minimized his current connections and dealings with BENDAYAN and SOTO. Contrary to SOI-2's most recent statements in which he has sought to distance himself from BENDAYAN and SOTO, SOI-2 is regular contact with both BENDAYAN and SOTO over his phone number in Panama. Second, SOI-2's has repeatedly claimed that he is not involved in black market money transactions and currency exchanges, though SOI-2 just so happens to be associated with several high level money launderers, including GUBERECK, MAFFI, and UZCATEGUI. In January 2012, SOI-2 told DEA agents from Puerto Rico that he in fact had conducted "due diligence" of the GUBEREKs' business and found nothing wrong. Investigators believe that SOI-2 has provided only partial information to law enforcement agents about his illicit activities, and is, at the very least, willfully blind to the illegal source of the funds he is helping to launder.

*Information from* ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

USAO00000091



## CRIMINAL USE OF THE TARGET TELEPHONES

*Identification of the Target Telephones*

150.    As further described above, Target Telephone #1 was identified as being used by SALOMON BENDAYAN during the course of the ███████████ wiretap investigation. Agents obtained one of LAOUI's phone numbers from a border search of ██████ ██████████ cell phone.  On September 29, 2013, Argentina Customs officials intercepted a call between ████████ and a then-unidentified male referred to as "Salo" about meeting the next

67

USAO0000009

day with LAOUI at the Hilton in Buenos Aires. The next day, on October 1, 2013, Argentina Customs officials observed ████ meet with SALOMON BENDAYAN. According to records maintained by DHS, BENDAYAN arrived in Buenos Aires that same day on September 20, 2013, on a flight from JFK International Airport in New York.

151.     Beginning in October 2013, Argentina Customs officials intercepted three phone calls between BENDAYAN and ████ in which BENDAYAN was using New York area phone number (917) 714-8868, which is Target Telephone #1. During these calls, ████ nd BENDAYAN discussed ongoing transactions (referred to as "operations") that could be conducted on a weekly basis, using different accounts for "security" reasons. Investigators in Colombia also intercepted a call on November 26, 2013, during which ████████ nd BENDAYAN talked about the movement of $500,000 on a weekly basis into five different bank accounts as well as the arrest of an individual and the need to move an asset into a different account under the name of a holding company in Hong Kong.

152.     According to records from AT&T Wireless, Target Telephone #1 is subscribed to PILOT HOLDINGS INC C/O J CALVO, at an address of 400 Avenue U Apt. 307, Brooklyn, New York, which is BENDAYAN's listed residence in New York. The account was activated in June 2010 and lists a contact name as "SALOMON BENDAYAN." According to AT&T Wireless, beginning on January 3, 2014, the user of Target Telephone #1 began having each incoming call automatically forwarded to a second cellular phone, T-Mobile phone number (917) 714-8866, which is Target Telephone #2. A review of pen register data for Target Telephone #1 confirms the activation of this call forwarding feature; all of the contacts for Target Telephone #1 since January 3, 2014, have been incoming calls. There are no outgoing calls on Target Telephone #1 since January 3, 2014. Based on telephone records, agents believe that when a caller places an

USAO00000093

unanswered call to Target Telephone #1 (which is forwarded to Target Telephone #2) and leaves a voicemail message, such message is recorded in the voicemail box for Target Telephone #1 and not the voicemail box for Target Telephone #2. Such a voicemail message may then be retrieved by BENDAYAN from any telephone.[18]

153. According to records from T-Mobile, Target Telephone #2 is subscribed to "BEDROCK HOLDINGS AMERICA," which is believed to be a New York corporation associated with ISSAC COHEN. The account for Target Telephone #2 was established on December 24, 2013. Investigators believe that BEDROCK HOLDINGS AMERICA is one of several different shell corporations that BENDAYAN, COHEN, and others in the United States use to launder the proceeds of drug trafficking and possibly other illegally derived funds. The "Mobile Number Name" listed on the accounts is "Bendayan."

*Pen Register Analysis – (917) 714-8868 - Target Telephone #1*

154. On December 9, 2013, the Honorable Judith G. Dein, U.S. Magistrate Judge for the District of Massachusetts, signed an order authorizing the installation of a pen register/trap and trace device on phone number (917) 714-8868, Target Telephone #1, for a period of 60 days. Thereafter, on February 10, 2014, the Honorable U.S. Magistrate Leo T. Sorokin, Chief U.S. Magistrate Judge for the District of Massachusetts signed an Order extending the authorization of the pen register/trap and trace device for an additional period of 60 days. Investigators have analyzed these records and have attempted to identify the potential users of these phone numbers through a variety of methods including administrative subpoenas for subscriber information and public source and internet searches. Investigators are unable to ascertain the user of many of

---

[18] For example, telephone records reflect that, on January 21, 2014 and again on January 25, 2014, Israeli telephone number 972507092929, believed to be used by BENDAYAN, dialed phone number (917) 714-8868 and accessed the voicemail box of Target Telephone #1.

USAO00000094

these cellular phones because they are either subscribed to the names of various companies (believed to be shell companies) or because the phone numbers in contact with the Target Telephones are outside the United States, in Venezuela, Colombia, the Netherlands, and Israel. The following is a list of the more relevant phone numbers being dialed to and from Target Telephone #1 based on pen register data from December 17, 2013 to February 18, 2014. This list also indicates the date of the last most recent contact[19] with Target Telephone #1.

| PHONE NUMBER | SUBSCRIBER/USER | CONTACTS | DATE RANGE |
| --- | --- | --- | --- |
| (786) 286-6181 (Florida) | ISAAC COHEN | 29 | 12/17/13 – 2/24/14 |
| (561) 809-7686 (Florida) | EDUARDO SOTO | 14 | 12/19/13 - 2/24/14 |
| (305) 318-6045 (Florida) | MARTIN LUSTGARTEN | 7 | 12/16/13 -- 12/24/13 |
| 507-60309944 (Panama) | MARTIN LUSTGARTEN | 3 | 2/3/14-2/24/14 |
| 57-310-212-3164 (Colombia) | ███████████ | 2 | 12/20/13 |
| 57-315-240-7410 (Colombia) | ███████████ | 9 | 2/12/14-2/21/14 |

155.     The first number listed above, Florida phone number (786) 286-6181, is used by ISSAC COHEN.  Between December 17, 2014, and February 24, 2014, there were 29 contacts between this phone number, (786) 286-6181, and Target Telephone #1.  Agents believe that COHEN is a money laundering associate of BENDAYAN and ███████████  COHEN resides in Florida, and is associated with an international trade company incorporated in New York called "Bedrock Holding LLC."   Target Telephone #2, which is used by BENDAYAN, is subscribed to

---

[19] In this affidavit, the term "contact" refers to an activation and dialing of a telephone to or from the target telephone and includes dropped calls, calls that go to voice mail and text or SMS messages. The term "contact" does not necessarily mean that an actual phone conversation took place, but instead only refers to the phone numbers being dialed and contacted to and from the target telephone.

USAO00000095

Bedrock Holdings America. On December 17 and 18, 2013, there were 2 contacts between the phone number listed on the Bedrock Holding website, (646) 495-9335, and Target Telephone #1. Foreign law enforcement officials have also intercepted calls regarding COHEN's involvement in the movement of large sums of money and what appear to be illicit debts. On November 26, 2013, Colombian law enforcement officials intercepted a call between ▮▮▮▮▮▮ n Colombia and BENDAYAN in which BENDAYAN talked about his conversation with "Isaac" about a debt that was owed by ▮▮▮▮▮▮▮▮▮ hat they are not going to forgive the debt ("we are not pardoning anything"). More recently, in early February 2014, Colombian law enforcement officials intercepted call between ▮▮▮▮▮ and a male in Florida believed to be COHEN who is using Florida phone number (786) 286-6181, the phone number listed above. During the call, agents believe that COHEN talked to ▮▮▮▮▮ about the transfer of approximately $500,000 in Colombia via a wire transfer because the exchange rate of Colombian pesos to U.S. dollars was 2,050 pesos/$1 U.S. dollar. COHEN also indicated that he would be traveling to Bogotá on February 15, 2014.

156. The second number listed above, (561) 809-7686, is subscribed to and believed to be used by EDUARDO ENRIQUE-SOTO. Between December 19, 2013, and February 24, 2014, there were 14 contacts between this phone number, (561) 809-7686, and Target Telephone #1. As further described above, investigators believe that SOTO assists BENDAYAN in the laundering of illegal proceeds through bank accounts in Hong Kong.

157. The third number listed above, (305) 318-6045, is a Miami phone number used by MARTIN LUSTGARTEN. Between December 16, 2013, and December 24, 2013, there were 7 contacts between this phone number, (305) 318-6045, and Target Telephone #1. As further described above, both LUSTGARTEN and SOTO had their bank account seized by the DEA in

71

USAO00000096

March 2009 on suspicion of money laundering. On February 3, 2014, a Panamanian phone number used by LUSTGARTEN, phone number 507-60309944 (the fourth number listed above) called Target Telephone #1. LUSTGARTEN traveled from Panama to the Boston area to meet with law enforcement agents later the same week on February 7, 2014. A second contact between these phones was made on February 20, 2014, and a third on February 24, 2014.

158.    The fifth and sixth numbers listed above, 57-310-212-3164 and 57-315-240-7410, based on Colombian wire intercepts, are used by ███████████████████ in Colombia. Investigators believe that URICOECHEA is a money laundering associate of BENDAYAN and COHEN who resides in Colombia. On December 20, 2013, there were 2 contacts between ███████████ first phone number, 57-310-212-3164, and Target Telephone #1; between February 12, 2014 and February 21, 2014, there were 9 contacts between ███████████ second phone number, 57-315-240-7410. The duration of the call on February 21, 2014, was 2 minutes and 20 seconds.

159.    In addition to the identified phone numbers above, Target Telephone #1 has a significant number of contacts with phone numbers in the United Kingdom, Hong Kong, Uruguay, Colombia, and Venezuela whose users of cannot be identified. For example, on January 27, 2014, Target Telephone #1 had 8 contacts with phone number 598-94495991 in Uruguay. As described above, on October 1, 2013, BENDAYAN flew to Uruguay on a private jet with ███████████ after meeting with LAOUI in Buenos Aires. Between January 5, 2014, and January 21, 2014, Target Telephone #1 had 5 contacts with a phone number in Hong Kong, 852-9611942. Over the past 60 days, Target Telephone #1 has also had contact with 6 different phone numbers in Colombia and 3 different phone numbers in Venezuela.

*Pen Register Analysis -- (917) 714-8866 - Target Telephone #2*

72

160.    On February 10, 2014, the Honorable Leo T. Sorokin, Chief U.S. Magistrate Judge

for the District of Massachusetts, signed an order authorizing the installation of a pen register/trap

and trace device on phone number (917) 714-8866, Target Telephone #2, for a period of 60 days.

In addition to pen register data, investigators have also obtained telephone toll records from

T-Mobile via administrative subpoena. The following is a list of the more relevant phone numbers

being dialed to and from Target Telephone #2 based on toll records and pen register data from

December 17, 2013 to February 11, 2014. This list also indicates the date of the last most recent

contact with Target Telephone #2.

| PHONE NUMBER | SUBSCRIBER/USER | CONTACTS | DATE RANGE |
|---|---|---|---|
| (786) 286-6181 (Florida) | ISAAC COHEN | 112 | 1/10/14 – 2/25/14 |
| 57-310-212-3164 (Colombia) | ███████████ | 3 | 1/10/14 – 1/15/14 |
| 507-60309944 (Panama) | MARTIN LUSTGARTEN | 6 | 2/12/14-2/24/14 |
| (561) 809-7686 (Florida) | EDUARDO SOTO | 8 | 1/22/14 – 2/24/14 |

161.    The first number listed above, (786) 286-6181, is believed to be used by ISSAC

COHEN.   Between January 10, 2014, and February 25, 2014, there were 112 contacts between

this phone number, (786) 286-6181, and Target Telephone #2.   As described above in paragraph

13(g), investigators believe that COHEN is a money laundering associate of BENDAYAN.   In

addition to this phone number, on January 16, 2014, there were 9 contacts between Target

Telephone #2 and phone number (646) 495-9335, a phone number previously listed for COHEN

on the Bedrock Holdings website.

162.    The second number listed above, 57-310-212-3164, is a Colombian phone number

used by ███████████████████████████    Between January 10, 2014, and January 15,

2014, there were 3 contacts between this phone number, 57-310-212-3164, and Target Telephone #2.

163.    The third number listed above, phone number 507-60309944, is a cellular phone for MARTIN LUSTGARTEN in Panama.  LUSTGARTEN resides in Panama. LUSTGARTEN traveled from Panama to the Boston area to meet with law enforcement agents the same week on February 7, 2014.  Thereafter, on February 11, 2014, Target Telephone #2 made an outgoing call to LUSTGARTEN at phone number 507-60309944. The duration of the call was 5 minutes and 20 seconds.  Thereafter, between February 12, 2014 and February 24, 2014, there were 6 contacts between this phone number, 507-60309944, and Target Telephone #2.

164.    The fourth number listed above, (561) 809-7686, is subscribed to and believed to be used by EDUARDO ENRIQUE-SOTO.  Between January 22, 2014 and February 24, 2014, there were 8 contacts between this phone number, (561) 809-7686, and Target Telephone #2.  As further described above, investigators believe that SOTO assists BENDAYAN in the laundering of illegal proceeds through bank accounts in Hong Kong.

165.    Similar to Target Telephone #1, Target Telephone #2 is also in frequent contact with a significant number of cellular phones in Colombia and Venezuela.  The identities of the users of these phones have not been identified. Over the past 60 days, Target Telephone #2 has had contact with 12 different phone numbers in Venezuela and 5 different phone numbers in Colombia.

166.    In addition to the above, an analysis of pen register data and telephone toll records also reveals that both Target Telephone #1 and Target Telephone #2 are in contact with many of the same phone numbers located outside the United States including 44-7516847385 (United Kingdom), 57-3152407410 (Colombia), 58-4168706995 (Venezuela) and 58-2129592394

74

USAO00000099

(Venezuela). Based, in part, on a common call analysis, agents believe that BENDAYAN is the user of Target Telephone #2. In particular, between December 24, 2013 (the date Target Telephone #2 was activated) and February 21, 2014, Target Telephone #2 was in contact with 217 phone numbers, 84 of which were also identified as having contact with Target Telephone #1. In addition, Target Telephone #2 is in regular contact (38 calls with Target Telephone #1 between 12/16/13 and 1/23/14 and 91 calls with Target Telephone #2 between 1/5/14 and 2/20/14) with a telephone number believed to be used by BENDAYAN's wife.

NEED FOR INTERCEPTION

167. Based upon my training and experience, as well as the collective training and experience of members of this investigative team, and our familiarity with the facts of this investigation as set forth above, it is my belief that the interception of the Target Telephones is the only available investigative technique, used in connection with other law enforcement techniques including additional possible wiretaps if necessary, which has a reasonable likelihood of revealing and securing admissible evidence needed to meet the goals of the investigation including, identifying the manner in which SALOMON BENDAYAN, ISSAC COHEN and others in the United States launder money; identifying the bank accounts and companies in the United States, Hong Kong and elsewhere that BENDAYAN, LAOUI, and others in the conspiracy use to launder money; ascertaining the nature and extent of BENDAYAN's relationship with suspected money launderers in Argentina, Colombia, Europe and elsewhere including, ███████ and ███████████████ identifying the individuals from whom BENDAYAN launders money; identifying the source of the millions of U.S. dollars involved in the suspected money laundering operations; identifying forfeitable assets; ascertaining the nature and extent of the relationship that ██████ and BENDAYAN may have with ███████████

75

USAO00000100

and identifying the precise nature and scope of the illegal activity of the Target Subjects and others unknown.

## ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED AND FAILED OR APPEAR UNLIKELY TO SUCCEED IF TRIED

168. Multiple traditional investigative techniques have been utilized in this investigation. The techniques utilized thus far have included interviews of cooperating defendants and cooperating sources of information; e-mail search warrants and the analysis of hundreds of seized e-mails; a search of publically available records, internet searches, and various law enforcement databases; the use of the undercover agents; physical surveillance of the Target Subjects both in the United States and abroad; foreign wiretaps in coordination with law enforcement agencies in Argentina, Colombia, and Spain; and an analysis of numerous banks and other financial records obtained via grand jury subpoenas. Each of these various traditional investigative techniques is discussed below.

### A. Use of Cooperating Defendant and Cooperating Source of Information

169. During the investigation, investigators from HSI and DEA have received information from four different cooperating defendants (CD-1, CD-2, CD-3, and CD-4) and two different cooperating sources of information (SOI-1 and SOI-2). Each of these cooperating defendants/sources of information have provided information about a network of international money launderers involved in the illegal movement and laundering of millions of U.S. dollars in Colombia, Venezuela, Hong Kong, and Europe. The information each of these cooperating defendants/source of information has been corroborated by independent evidence including e-mail search warrants, financial records, foreign wiretaps, an undercover operation, and admissions by Based on this information, agents believe that BENDAYAN,

76

COHEN, and ▮▮▮▮ are involved in the laundering of drug proceeds from the sale of illegal drugs in the United States and possibly Europe that is manufactured in Colombia and imported into the United States from Argentina, Colombia, Mexico, and/or other locations in South or Central America in a trade based money laundering scheme that involves bank accounts and businesses in the United States, Argentina, Colombia, Hong Kong, and elsewhere. Some of these cooperating sources of information have also provided evidence that ▮▮▮▮▮ is involved in the laundering of billions of U.S. dollars and other currencies derived not only drug trafficking, but also from fallen dictatorships in the Middle East and possibly terrorism. However, as further described below, none of these sources of information are able or willing to provide any current information about BENDAYAN's current money laundering activities and none of them are in a position to infiltrate the organization either directly or through the use of an undercover agent.

170.    According to CD-1, BENDAYAN was involved in a trade-based money laundering scheme involving Venezuela, Colombia, and Hong Kong between 2007 and 2009, and was responsible for setting up banks accounts in Hong Kong to launder drug money. CD-1, however, also told agents that CD-1 no longer has any contact with BENDAYAN. The indictment in which CD-1 was named has also been widely publicized and it is well-known that CD-1 is under indictment for money laundering charges. Based on this, investigators believe that CD-1 would not be able obtain any current information about BENDAYAN's activities, engage BENDAYAN in incriminating conversations, or introduce an undercover agent. Moreover, thus far, while CD-1 agreed to be interviewed by the DEA, CD-1 is currently located outside the United States, has not signed any type of plea or cooperation agreement, and has not yet surrendered to U.S. law enforcement authorities. For this reason, it is not clear whether or not the U.S. government would

77

USAO00000102

be able to use CD-1 as a witness against BENDAYAN. CD-1 also did not provide any information about the other primary Target Subjects, including ▮

171. The second cooperating defendant, CD-2, provided more limited information about BENDAYAN. Unlike CD-1, CD-2 did not provide any direct evidence of information about BENDAYAN's money laundering activities, but instead corroborated CD-1's information and provided further details and explanations regarding the trade-based and foreign investment money laundering scheme involving *CADAVI*. CD-2 is also incarcerated in the United States and thus is unable to provide any type of proactive cooperation. CD-2 was also unable to provide any information about any other Target Subject other than BENDAYAN.





174.    Unlike the other sources of information, based on phone records and pen register data, SOI-2 has current contact with BENDAYAN.   Unlike the other cooperating sources of information, SOI-2 denies ever being involved in money laundering activities.   Instead, SOI-2 told agents that his company and SOI-1's company's in Venezuela (Clifton Capital and Arbitrage and Lending) was in the business of providing loans.   SOI-2 also claimed that SOI-2 had conducted "due diligence" and a site inspection of GUBRECK's companies, even though HENRY and ISSAC GUBEREK were later indicted for money laundering and the U.S. Treasury Department designated GUBEREK's companies on the OFAC list.   For this reason, investigators suspect that SOI-2 is purposely withholding information about BENDAYAN and SOI-2's own involvement in international currency exchange transactions to which SOI-2 is willfully blind as to the source of the funds.

USAO00000104



176.     I am currently unaware of any other confidential informants or cooperating

witnesses who could provide investigators with admissible evidence to achieve the stated goals of

this investigation or to infiltrate the organization. Nevertheless, even if one of these confidential

sources of information could make contact with BENDAYAN or ▮▮▮▮▮ in my opinion such an

individual would be unable to provide evidence about the full scope of the international network of

money launderers that is under investigation. Furthermore, while SOI-1 maintains contact with

▮▮▮▮▮ according to SOI-2 ▮▮▮▮▮ oes not fully trust SOI-1and only provides SOI-1 with

limited information.   Based on my experience and the experience of other law enforcement agents

with whom I have worked, I believe that members of an organization, similar to this organization,

insulate the information that they provide to others as a means of protecting themselves from being

infiltrated by law enforcement. Thus, I believe that it is highly unlikely that any cooperating

individual could learn about the full scope of the organization, the role each participant plays and

the manner and means through which the organization launders drug proceeds.

B.    Use of Undercover Agents

177.    Agents are currently seeking to use an undercover agent to infiltrate a part of the money laundering network under investigation. Beginning around January 2014, DEA TFO Jaime Cepero, acting in an undercover capacity, has been negotiating with ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Investigators will seek to utilize the undercover operation, but there are limitations on what law enforcement agents can do in an undercover capacity. While agents are permitted to launder a certain portion of illegal funds to infiltrate an organization, law enforcement agents cannot also serve as a facilitator to the laundering of large sums of money without concrete investigative results, seizures, and criminal charges. Law enforcement agents also have limited capabilities in international undercover operations and need to rely upon the cooperation of the foreign countries involved, which is particularly more difficult and dangerous in the Middle East. At some point in the investigation, agents may also seek to use SOI-1 to seek ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ situation. With regards to BENDAYAN and ▮▮▮▮▮ agents did not have any type of reliable informant that could introduce an undercover agent into the network of money launderers under investigation.

81

C.   Physical Surveillance

178.   Physical surveillance has been used in this case.   In September 2013, agents attempted to conduct surveillance of ███████████████ as he arrived in Boston for one day on a flight from Mexico.   In October 2013, Customs Officials conducted surveillance of ██████ n Buenos Aires, observed ███████ meet with BENDAYAN, and observed BENDAYAN meet with ████████████████ This surveillance, along with wiretaps in Argentina, led to the identification of some of ██████ uspected criminal associates.   Investigators also anticipate seeking to conduct surveillance of ISSAC COHEN in an upcoming trip to Colombia to meet with ███████████.

179.   Physical surveillance, however, in an international money laundering investigation such as this one, is of limited utility.   The international movement of money is often conducted via wire transfers across bank accounts.   The participants in this money laundering scheme are also careful and sophisticated, and have the financial means to insulate themselves from ever coming into direct contact with drugs or narcotics trafficking.   Furthermore, while agents believe that funds that are being laundered are derived from drug sales in the United States and are in part being laundered through U.S. banks, a large portion of criminal activity under investigation takes place overseas in Colombia, Venezuela, Argentina, Hong Kong, and Dubai. United States government law enforcement agents are unable to conduct surveillance in a foreign country without the express permission and participation of that foreign country.   In some situations, as in Argentina, public corruption is a significant obstacle to an effective prosecution and requests from the U.S. government to central government authorities in Argentina could be compromised. The United States also does not receive significant levels of cooperation and evidence sharing from many of the countries where the targets of the investigation reside, including Venezuela.

180. Additionally, based on my training and experience, I know that surveillance can rarely be conducted of meetings that occur inside buildings or inside other structures, especially when the place of the meeting is small and/or intimate in nature for the targets of the investigation. Even if meetings between the subjects of this investigation occur out in the open, surveillance is very limited as an evidence gathering tool. Such surveillance of a meeting between two or more subjects of the investigation does not provide essential information such as the topic of the meeting, the roles of the participants, or what occurred at the meeting.

D. Interviews of Subjects of the Investigation

181. As further described above, agents have attempted to interview several targets of the investigation, including ████████████████████████████ (SOI-1).



████████████████████████ Similarly, while LUSTGARTEN has cooperated with the DEA for several years, investigators suspect that LUSTGARTEN has been willfully blind to his own multi-million U.S. dollars and the illegal money laundering activities of his associates. After multiple interviews, agents believe that it is unlikely that LUSTGARTEN will inculpate himself in illegal activity unless and until he his confronted with evidence that implicates him in money laundering activities.

182. Based on my training and experience, I also do not believe that interviews of any of targets of the investigation in the United States, namely SALOMON BENDAYAN, ISSAC

COHEN, and/or EDUARDO ENRIQUE SOTO, will accomplish the goals of the investigation. Unless and until these individuals are confronted with compelling evidence of illegal money laundering, they are unlikely to cooperate. BENDAYAN, COHEN, and LUSTGARTEN as well as HENRY GUBERECK, are also part of a tight-knit Jewish community in Venezuela are highly unlikely to betray and implicate their close associates in criminal activity. For this reason, it is highly unlikely that these individuals will agree to cooperate, and potentially place themselves in harm's way, without a strong incentive like the potential threat of federal prosecution. At this point, investigators do not have enough evidence to seek criminal charges against any member of the organization to achieve this goal. Instead, interviews of the targets of the investigation will most likely cause them to alert other members of the organization, cause them to curtail their activities, destroy or hide evidence, or possibly flee.

E.    Telephone Records and Pen Register/Trap and Trace

183.    The register/trap and trace information has and will provide valuable information regarding contact between Target Telephones and criminal associates. Pen register data, together with telephone toll records, has provided valuable information regarding the telephones numbers that are in contact with Target Telephones. However, such devices have a limited usefulness in this investigation. First and foremost, the content of the conversations is not intercepted on pen register data. In this case, I believe discussions and details about international money laundering transactions are taking place in phone calls between BENDAYAN and his associates, including DIEGO LAOUI, ISSAC COHEN, EDUDARDO ENRIQUEI SOTO, and ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ However, without the actual content of these wire communications, investigators are unable to prove the exact nature of the transactions that are being discussed or executed over the Target Telephones.  In addition, BENDAYAN has frequent international travel and has

84

USAO00000109

contact with multiple phone numbers outside the United States in Venezuela, Colombia, Israel the Netherlands, and the United Kingdom. Investigators do not have administrative subpoena power outside the United States and are unable to identify the users of many of these foreign cellular phones. Lastly, even if such devices provide the identity of a member of the organization, the pen registers, etc. rarely succeed in gathering sufficient evidence of the criminal activities under investigation.

184. During the course of the investigation, investigators in conjunction with the U.S. Attorney's Office have issued numerous grand jury subpoenas for documents and records relating to banks accounts, wire transfers, and other financial records related to the targets of the investigation. In the case of SALOMON BENDAYAN, investigators have recently learned that BENDAYAN has approximately 90 different bank accounts at JP Morgan Chase over which he has signatory authority. These records, however, do not provide direct evidence of the source of these funds. Because the point of concealment of money laundering is to conceal the nature and ownership of the funds, it is unlikely that any business or bank records will identify the illegal source of the funds or the true ownership of the funds.

185. In addition, many of the bank accounts and companies that are suspected of being used to facilitate the laundering of drug money and other illegal proceeds are located outside the United States in Hong Kong, Dubai, and Switzerland, outside the grand jury's jurisdiction. Earlier in the investigation, in May 2013, the U.S. Attorney's Office submitted a Mutual Legal Assistant Treaty Request ("MLAT") for various companies related to          money laundering activities, but Swiss authorities indicated that Swiss privacy bank laws would be required to notify the targets of the treaty request.

85

186.    Furthermore, after consulting with Assistant United States Attorneys Neil
Gallagher and Linda Ricci, I believe that the issuance of grand jury subpoenas to compel witness
testimony would be unsuccessful in exposing the full nature and scope of the criminal activity, or
the identities of all the participants. Presently there are no known witnesses, other than those
previously discussed, who are knowledgeable about the organization, who would be willing to
testify before the grand jury, and who could be relied upon to maintain confidentiality. Moreover,
with the exception of BENDAYAN, COHEN, and SOTO, most of the targets reside outside the
United States. If the domestic subjects were subpoenaed to testify in the grand jury, I believe that
they would flee and thereby become unavailable. Even if the subjects would not flee, I believe the
targets would most probably invoke their Fifth Amendment testimonial privilege and, even under
a grant of immunity, accept contempt charges rather than testify against their co-conspirators.
Other subpoenas might be useful in collecting corroborative information, but insufficient details of
criminal activities are known to provide leads to such records. Moreover, the details of criminal
activities are unlikely to be found in records which could be accessed without compromising the
investigation. Finally, issuing grand jury subpoenas for testimony would have the effect of alerting
the members of the conspiracy about the existence of the investigation, thereby compromising the
investigation and resulting in the possible destruction or concealment of documents and other
evidence.

187.    In January 2013, HSI agents obtained federal search warrants for e-mail accounts
used by ██████████████████████████████████████ The results of these
warrants produced thousands of emails that investigators are still in the process of analyzing. For
the most part, these emails involve the transfer of financial documents and contracts relating to the
movement of hundreds of millions of U.S. dollars; passports and other foreign identifications; and

86

USAO00000111

email conversations about transactions, but nothing that explicitly states the source of the funds. At times, investigators have also observed emails related to financial instruments that have been found to be fraudulent. While investigators will continue to pursue additional e-mail search warrants, without the use of other investigative techniques, the seized emails are unlikely to accomplish the goals of the investigations because the e-mails do not identify the source of the funds. Furthermore, upon the execution of an e-mail search warrant, investigators are unable to receive the seized data from the service providers for at least one month and, based on the volume of data, are unable to analyze the data in a rapid manner. For this reason, it is unlikely that the mere seizure of emails will lead to any type of seizure of illicit proceeds that is in transit.

188. Investigators have also contemplated the execution of search warrants at some of BENDAYAN and his associates companies, but for the most part, appear to be shell companies without any physical address. Instead, the business addresses are actually associated with the target's home address or a law firm that is registered agent for the company. At this point, investigators also do not have sufficient probable cause to obtain search warrants at any locations in the United States.

189. Due to the fact that evidence is presently unavailable from other investigative avenues, even when those investigative techniques are being used together, as in this case, there is an overwhelming need to intercept the wire and electronic communications to and from the Target Telephones in order to fully reveal the manner and scope in which the subjects are involved in violation of federal money laundering statutes.

MINIMIZATION

190. It is believed that BENDAYAN primarily uses the Target Telephones outside the District of Massachusetts. Pursuant to 18 U.S.C. §§ 2518(3) and 2510(4), the interception of all

USAO00000112

wire communications to and from the Target Telephones will take place within the territorial jurisdiction of this Court, inside the District of Massachusetts, specifically, in Watertown, Massachusetts.

191.    The requirements regarding the minimization of interception will be strictly followed. Before interception begins, a memorandum regarding minimization and a copy of the Court's Order authorizing interception will be provided to all monitoring agents. A copy of the Order and minimization memorandum will be posted at the listening site. Before an agent or government contract monitor begins to intercept communications, he or she will sign a form indicating that he or she has read the Affidavit, the Court's Order authorizing interceptions, and the minimization memorandum; is familiar with the contents of the Order; has attended a minimization meeting; and will intercept communications in compliance with the Court's Order.

192.    All wire communications will be minimized in accordance with Chapter 119 of Title 18 of the United States Code. Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that none of the Target Subjects or any of their criminal associates, once identified, is participating in a conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Even if one of the Target Subjects or their criminal associates, once identified, is a participant in a conversation, monitoring will be suspended if the conversation is not criminal in nature or not otherwise related to the offenses under investigation. Based on information provided by other monitoring and supervising agents, I believe that many money laundering-related conversations may occur in the course of otherwise innocent conversations. Once interception has begun, monitors will use information obtained from previous interceptions to help determine whether a particular call should be minimized as a non-pertinent

88

call. Lengthy conversations that appear to be non-pertinent periodically will be monitored to determine if the conversation has become criminal in nature. All intercepted wire communications will be recorded and all recordings will be securely preserved. Logs will be prepared regarding the date and time of calls, the parties involved, the subject matter of the calls, and if and when minimization occurred. Reports detailing the course of the interception will be filed with the Court on or about the tenth and twentieth days following the commencement of interception pursuant to the Court's Order. Particular emphasis will be placed on reporting minimization efforts to the Court. Monitors will be advised to follow normal minimization procedures with respect to any intercepted communications involving an attorney or other privileged communication. Monitoring agents will be advised that a privilege attaches to communications between an attorney and an individual concerning a matter in connection with which the attorney represents that individual. They will be instructed to suspend monitoring of a conversation as soon as they learn that it concerns such a matter, so long as there is no reason to believe that the purpose of the conversation is to further crime or fraud.

193. None of the target subjects has a pending criminal matter. All monitoring agents will be instructed to minimize all conversations involving an attorney and a party represented by that attorney if the conversation pertains to the represented party's culpability in relation to an indictment or pending indictment or charges or pending charges against him or her or the strategy which he or she contemplates employing in defense of such charges.

194. It is anticipated that most of the conversations to be intercepted will be in Spanish. Some conversations may also take place in English and possibly Hebrew. Since most of the calls are expected to be in Spanish, I expect to use Spanish-speaking contract monitors and police officers, acting under the supervision of investigative or law enforcement officers who are

89

authorized to conduct the interception. Because it is anticipated that most of the wire communications to be intercepted will be in the Spanish language, it is expected that an expert in the Spanish language will be available for translation whenever possible. Pursuant to 18 U.S.C. § 2518(5), the following minimization procedures have been established in the event that conversations in a code or other foreign language are intercepted:

> (a) If foreign language translators are not reasonably available to minimize wire communications at the time of interception, all such wire communications will be intercepted and recorded in their entirety and then minimization will be accomplished as soon as practicable after said interception;

> (b) In the event the translator is not a federal law enforcement agent, the translator, whether he or she is language-trained support employee or under contract to the government, will be under the supervision of a federal agent or other law enforcement officer; and

> (c) Wire communications monitored by the translator under the guidance of a federal agent or other law enforcement officer will be minimized by the translator and an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent or other law enforcement officer.

195.    I believe that this procedure, which provides for after-the-fact minimization of foreign languages used by the named Target Subjects when there is no expert reasonably available to translate the conversation, complies with 18 U.S.C. § 2518(5) and its provisions for specialized minimization procedures when intercepting communications conducted in a foreign language.

196.    Agents will also attempt to minimize any voice mail messages to the Target Telephones that are intercepted. However, it is unclear whether it will be possible to set up a

USAO00000115

system that will permit agents to intercept voice mail messages left on the Target Telephones on a "real time" basis. In other words, monitoring individuals may not be able to listen to messages at the precise moment the messages are being left by callers. However, it may be possible to intercept the voice mail messages as they are being retrieved by persons using the Target Telephones. In the event that this is possible, although the interceptions will not be made at the time the messages are left, monitors will be able to minimize the messages at the time that they are being retrieved. This would be very similar to a real time minimization procedure.

197.  It is believed that the communications to be intercepted will reflect a continuing criminal conspiracy, thereby necessitating the interception of communications on a continuing basis following the initial receipt of the particular communications that are the subject of this request for interceptions. Therefore, it is requested that the Court Order state that the authorized interceptions not automatically terminate when incriminating communications are initially intercepted, but continue until the attainment of the authorized objectives or, in any event, at the end of thirty (30) days, measured from the earlier of the day on which the investigative or law enforcement officers first begin to conduct the interception under the Court's Order or ten (10) days after the Order is entered, whichever is earlier.

Michael K. Krol, Special Agent
Department of Homeland Security
Homeland Security Investigations

**SUBSCRIBED and SWORN**
to by me this 28th day of
February, 2014
Time: 11:09 a.m.

DENISE JEFFERSON CASPER
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**ATTACHMENT A**

*Argentina Wiretap Investigation*

1.  On or about August 29, 2013, the presiding judge in Buenos Aires, Argentina, the
    Honorable Federal Judge Adrian Gonzalez Charvay, authorized for a period of 60 days
    the interception of the following cellular telephones used by ███████████ n
    Argentina: 11-5419-2026 and 33-4998-7555.

2.  On or about October 24, 2013, the presiding judge in Buenos Aires, Argentina, the
    Honorable Federal Judge Adrian Gonzalez Charvay, authorized for a period of 30 days
    the interception of the Nextel Point to Point ("PTT") number 54*446*83 used by ██████
    ████ Argentina.

3.  On or about November 28, 2013, the presiding judge in Buenos Aires, Argentina, the
    Honorable Federal Judge Adrian Gonzalez Charvay, authorized a 30 day extension of the
    interception of the following cellular telephones used by ██████████ in Argentina:
    11-5419-2026 and 33-4998-7555.

4.  On or about January 29, 2014, the presiding judge in Buenos Aires, Argentina, the
    Honorable Federal Judge Adrian Gonzalez Charvay, authorized a 30 day extension of the
    interception of the following cellular telephones used by ██████████ in Argentina:
    11-5419-2026, 11-4998-7555, as well as Nextel PTT 54*446*83 used by ████████
    ██████

*Colombia Wiretap Investigation*

5.  Beginning in or about November 2013, the presiding Colombian prosecutor in Bogotá,
    Colombia authorized the interception the following cellular phones used by ████████
    ███████████████ in Colombia: 310-212-3164 and 315-240-7410.
    Specifically, pursuant to this authorization, on or about November 13, 2014, Colombian
    law enforcement officials began the interception of cellular phone number 310-212-3164.
    Thereafter, on or about February 18, 2014, Colombian law enforcement officials began
    the interception of cellular phone number 315-240-7410. The interception of these
    cellular phones is authorized for a period of 90 days, but is subject to the ratification by a
    judge in Colombia.

*Safwan Madarati Wiretap Investigation*

6.  On March 1, 2011, the Honorable U.S. District Court Judge George A. O'Toole, Jr.
    signed an Order authorizing the interception of wire and electronic communications to
    and from the following target devices used by SAFWAN MADARATI: (a) Verizon
    Wireless cellular telephone number (617) 335-2078, subscribed to Safwan Madarati, 185
    Warren Street, Watertown, MA 02472-1721, on a Blackberry device bearing MEID
    number 268435457300912207; (b) T-Mobile USA cellular phone number (617) 319-
    5012, subscribed to Sam White, bearing IMSI 310260438332167; and (c) T-Mobile USA
    cellular phone number (207) 385-7803, subscribed to Devin Johnson bearing IMSI